STATE of Minnesota, Respondent,

v.

Michael Joseph HALL, Jr., Appellant.

No. A08–467.

Supreme Court of Minnesota.

May 7, 2009.

Lawrence Hammerling, Chief State Appellate Public Defender, Michael F. Cromett, Assistant State Public Defender, St. Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, Minnesota, for respondent.

## OPINION

GILDEA, Justice.

A Ramsey County jury found appellant Michael Joseph Hall, Jr., guilty of first-degree premeditated murder in connection with the shooting death of Shawn Moore. Hall brings this direct appeal challenging a number of the district court's evidentiary rulings and he argues that the jury instructions were erroneous. We affirm.

The evidence at trial established that Shawn Moore was fatally wounded on April 29, 2007. The shooting happened outside the St. Paul apartment Moore shared with his girlfriend, S.B. Witnesses identified Moore's assailant as Hall, who is S.B.'s brother.

The State offered evidence showing that Hall and Moore had been at odds, in part because of the relationship between Moore and S.B. Moore and S.B. began living together in late 2006. But in March 2007, S.B. moved out and ended her relationship with Moore. When S.B. ended the relationship, Moore threatened to kill her and her family, including her children.

On April 9, 2007, approximately three weeks before the murder, Hall was on his way to his mother's house to pick up some documents when he learned that Moore was there. Hall's mother was concerned about Moore's presence. Moore spoke to Hall and when Hall ignored him, Moore insulted Hall by using derogatory language. After Moore left, Hall called Moore's cell phone number and told Moore not to come to Hall's mother's home anymore. Moore then returned to the home and he and Hall exchanged words. Moore threatened to kill Hall and mutilate his body. Hall drew a gun from his waistband, set it on the hood of his car and told Moore to get his gun. When Hall's mother intervened, Hall put his gun away and drove away with his girlfriend. Moore drove after them, made threatening hand gestures to Hall, and his car hit Hall's car on the passenger's side. Hall reported the incident to St. Louis Park police.

Later in April, S.B. and Moore moved back in together. Hall learned that his sister and Moore had renewed their relationship, and the difficulties between the two men continued. For example, a witness testified that shortly after Moore renewed his relationship with S.B., Moore went looking for Hall armed with a gun. There was also testimony at trial establishing that Hall and Moore exchanged several threatening messages between April 9 and April 29, with most of the calls coming from Hall. Hall testified that the calls he placed to Moore's phone were prank calls, not threats.

On the night of the shooting, Moore was at his apartment with S.B. and her children. A friend, R.T., was also there. At approximately 9:40 p.m., Moore went outside the apartment to smoke a cigarette. S.B. testified that she heard two loud pops while Moore was outside. R.G., a friend of Moore's, testified that he was sitting in Moore's car in the parking lot behind the building on the night of the murder, drinking and dozing off in the passenger seat when he heard two gunshots. After hearing the gunshots, R.G. saw Hall run down the sloped yard of the apartment building and get into his car. R.T. looked out the window of the apartment after hearing the gunshots and saw Hall drive out of the parking lot. R.G. testified that Hall drove away without turning on the car's headlights.

S.B. testified that the wounded Moore ran into the apartment and said, "They got me." R.T. testified that he remembered Moore's initial statement as, "He shot me in my back." S.B. asked who Moore meant and Moore replied, "Mike," whom S.B. understood to be Hall. Moore stumbled down the hallway and collapsed near the bathroom. S.B. then called the police.

When the police arrived, they found Moore bleeding profusely. He was transported to Regions Hospital by ambulance but was declared dead on arrival in the emergency room at 10:13 p.m. The cause of death was a single gunshot wound. Moore also had a laceration on his lower lip, a sign of blunt force injury, possibly from a fall, kick, or punch.

Forensic evidence established that when he was shot, Moore was in the hallway of the apartment building that leads from the back door of the building to his ground floor apartment. He was shot a few centimeters below the left scapula, or shoulder blade, with a .40 caliber semiautomatic pistol. Two shots were fired at Moore in quick succession and in a downward trajectory. Law enforcement identified the murder weapon as a gun owned by Hall's former girlfriend, C.J. Hall testified that he used C.J.'s gun to shoot Moore, and that he returned it to C.J. shortly thereafter. Finally, the forensic evidence established that Moore was shot through the glass window of a security door at the rear of the building.

S.B. told one of the responding police officers that Hall had shot Moore and described the car Hall was driving. Hall, meanwhile, called his mother and told her, "Something bad just happened." Police subsequently arrested Hall.

Sergeant Daniel Moriarty of the St. Paul Police Department interviewed Hall following his arrest. The interview began approximately three hours after the shooting, at 12:56 a.m. on April 30. Moriarty advised Hall of his *Miranda* rights, including his right to counsel. Moriarty said he wanted to hear Hall's side of the story regarding what had happened to Moore. Hall said he first wanted to hear the officer's side of the story. Hall said he had no idea why he had been arrested. Told by Moriarty that Moore had been shot, Hall twice responded, "Mm-hmm." Asked whether he had shot Moore, Hall replied, "I don't have any comment about that, I'm just listenin', I'm just hearin' your side of the story." Moriarty said he knew Hall had shot Moore and asked Hall why he did it. Hall responded, "I'm not admitting to anything and I'm just talkin' to you about a story you're tellin' me, so, I'm not, until I have a lawyer, you know, I'm not really gonna break down anything. You know?" Hall said even if, "hypothetically," he had been at the scene, someone else could have shot Moore.

During the interview with police, Hall denied owning or recently purchasing a handgun. "As far as I know I'm actually ineligible I believe," Hall told Moriarty. Hall continued, "Uh, fifth-degree assault, don't that make me ineligible?" Moriarty responded, "Okay. I didn't know you had an assault." Moriarty immediately returned to his line of questioning, asking whether C.J., Hall's former girlfriend, had purchased a handgun for Hall. Hall denied that she had done so. Another police officer, Sergeant James Gray, arrived during the latter half of the interview to administer a gunshot residue test to Hall. Asked by Gray when he had last fired a gun, Hall replied, "Who says I have fired a gun? Who says I have even held a gun before?" Hall said he might have fired a gun earlier on April 29 on private land in Farmington but refused to identify the landowner. About 23 minutes into the interview, Hall said to Moriarty, "So what's the deal man? You gonna give me a lawyer or what?" The interview continued for approximately 37 more minutes.

A grand jury subsequently indicted Hall on one count of first-degree murder with premeditation in violation of Minn.Stat. § 609.185(a)(1) (2008) and one count of second-degree murder in violation of Minn. Stat. § 609.19, subd. 1(1) (2008). A jury trial commenced on November 26, 2007.

Hall testified in his own defense. Hall admitted that he shot Moore but claimed he did so in self-defense after Moore "burst" out of the apartment building's back door and hit him with a .38 revolver. Hall explained that he punched Moore in the mouth and tried to run away, but Moore grabbed him, and that was when Hall fired his gun.

The jury found Hall guilty of first-degree murder with premeditation, not guilty of second-degree murder, and not guilty of first-degree manslaughter in the heat of passion, Minn.Stat. § 609.20(1) (2008).[1] The district court convicted Hall and sentenced him to life in prison. This direct appeal follows.

## I.

■ The first five of Hall's six arguments involve evidentiary rulings by the district court. Specifically, Hall argues that the court erred by: (1) allowing the jury to hear Hall's request for an attorney while he was being questioned by police; (2) refusing to redact Hall's statement to police revealing a prior misdemeanor assault conviction; (3) preventing Hall from challenging the credibility of his statement to police; (4) allowing prosecutors and witnesses to refer to Shawn Moore as the "victim"; and (5) prohibiting Hall from impeaching Moore's dying declaration identifying Hall as the person who shot him. The district court has "broad discretion" when it comes to the admission of evidence, and we therefore will upset such rulings only if it can be said that the court abused its discretion. *State v. Hooper*, 620 N.W.2d 31, 38 (Minn.2000). A defendant who asserts that the court erroneously admitted evidence must show both the error and resulting prejudice. *State v. Lindsey*, 632 N.W.2d 652, 662–63 (Minn.2001).

## A.

■ We turn first to Hall's argument that the district court erred in admitting a portion of the statement he made during the custodial interrogation. During trial, the court ruled that Hall's statement could be admitted up to his question, "So what's the deal man? You gonna give me a lawyer or what?" The court found that this question was an ambiguous request for a lawyer, and that after such a request, police questioning should have stopped, except for clarifying questions about the request for counsel. Accordingly, the court ruled that "everything up to there is good. Everything after there is not good." Hall argues that the court committed error justifying a new trial because the court let the jury hear his question about a lawyer, and that the admissible portion of the interview should have stopped *before* that question.

We have said, "A defendant's choice to exercise his constitutional right to counsel may not be used against him at trial." *State v. Juarez*, 572 N.W.2d 286, 290 (Minn.1997) (citing *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Roberts*, 296 Minn. 347, 352, 208 N.W.2d 744, 747 (1973)). In *Juarez*, the defendant was being interrogated on suspicion of sexually assaulting children when he stated, "I'm gonna have to get a lawyer next." *Id.* We concluded that allowing the jury to hear that statement was error, because it left the jury likely to infer that the defendant was concealing his guilt. *Id.* at 291.

Hall argues that, just as in *Juarez*, the only inference that a jury could draw from his statement was that he was concealing his guilt. The State responds that the jury was not likely to infer that Hall was concealing his guilt "because he clearly was concealing it." We agree with Hall and hold that it was error for the court to

---

1. This crime was submitted to the jury as a lesser-included offense.

allow the jury to hear Hall's question about a lawyer.

But the district court's ruling is subject to harmless-error analysis. Because the error involved admission of Hall's statement in violation of his *Miranda* rights, as in *Juarez*, it was constitutional error, and thus we must examine whether the error was harmless beyond a reasonable doubt. *Juarez*, 572 N.W.2d at 291 (considering whether erroneous admission of defendant's request for a lawyer was harmless beyond a reasonable doubt). An error is harmless "[i]f the verdict rendered is 'surely unattributable' to the error." *Id.* at 292; *see also State v. Quick*, 659 N.W.2d 701, 716 (Minn.2003) (noting that evidence admitted in violation of a constitutional right is not harmless if there is " 'a reasonable possibility that the verdict might have been different' " (quoting *State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994))).

In determining whether a constitutional evidentiary error is harmless beyond a reasonable doubt, we consider the "manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, ... whether it was effectively countered by the defendant," and the strength of the evidence of guilt. *State v. Al–Naseer*, 690 N.W.2d 744, 748 (Minn.2005). In this case, the evidence at issue was presented very briefly as part of the State's examination of the interrogating officer. The State did not focus on Hall's question about a lawyer during its presentation of evidence or during closing argument. Moreover, Hall's ambiguous request for a lawyer was not persuasive evidence of Hall's guilt under the circumstances, as it came during an interview in which he admitted nothing. The lack of probativeness of guilt is confirmed by the fact that Hall himself referenced several times in his trial testimony that the reason he did not respond to certain of the officer's questions was because he did not have a lawyer with him during the interrogation.

With respect to the evidence of Hall's guilt, we have carefully reviewed the record and conclude that the evidence of Hall's guilt is strong. The evidence included the witnesses who heard gunshots and then saw Hall running from the building, Moore's own statement that "Mike" had shot him, the evidence that matched C.J.'s gun to the shooting, and Hall's testimony that he used C.J.'s gun to shoot Moore and returned it to her immediately thereafter. The evidence established that Moore was shot in the back, through a door. Finally, when he was arrested, Hall did not have any markings on him consistent with his having been "pistol-whipped" by Moore, as Hall claimed during his testimony, and the police did not locate, either on Moore or otherwise, the gun with which Moore supposedly confronted Hall.

Under all of these circumstances, we hold that the error in allowing the jury to hear Hall's ambiguous request for a lawyer was harmless beyond a reasonable doubt.

## B.

We next consider Hall's argument that the district court erred in refusing his request to redact his statement during the police interrogation where he appeared to reveal that he had a prior fifth-degree assault conviction. Hall argues this was an error that necessitates a new trial. The State argues that the court was correct that the prior conviction had probative value to show Hall was lying about possessing a gun and was not overly prejudicial.

We have recognized that a defendant's references to prior crimes or prior imprisonment should generally not be admitted in evidence. *State v. Hjerstrom*, 287 N.W.2d 625, 627 (Minn.1979); *State v. Haglund*, 267 N.W.2d 503, 505–06 (Minn.

1978). But even if it was error for the district court not to have ordered that Hall's reference to an assault conviction be redacted from his statement, a new trial is not warranted unless Hall demonstrates that he was prejudiced by the error. *Haglund*, 267 N.W.2d at 506.

For example, in *Haglund*, even though admission of the statement constituted error, the error did not justify a reversal. 267 N.W.2d. at 506. A new trial was not warranted in that case because the defendant's comment about his prior imprisonment was unintentionally elicited by the prosecutor; the reference to the prior imprisonment was of a passing nature, the import of which might have been missed by the jury; and the evidence of the defendant's guilt was overwhelming. *Id.* In *Hjerstrom*, the evidence of defendant's guilt was overwhelming, so that "it was extremely unlikely that the evidence prompted the jury to convict where it otherwise would not have." 287 N.W.2d at 628. We reach the same conclusion in this case.

Because Hall's statement was phrased in the form of a question, it was more ambiguous than the statements in *Hjerstrom* and *Haglund*. And as in *Haglund*, Hall's reference to a fifth-degree assault conviction was unintentionally elicited by the interrogating officer. The reference to the prior conviction was of a passing nature, and neither the officer nor the prosecutor dwelled on the statement or highlighted it for the jury. Finally, as set forth above, there was strong evidence of Hall's guilt. As in *Hjerstrom* and *Haglund*, it is very unlikely that the prior assault comment "prompted the jury to convict where it otherwise would not have." *Hjerstrom*, 287 N.W.2d at 628. We therefore hold that any error was harmless.

### C.

We next consider Hall's argument that the district court erred when it prevented the defense from inquiring about the manner in which Hall's statement was taken by the police. In a pretrial motion, the State asked the court to prohibit "the defense from inquiring, offering evidence, or commenting upon in the presence of the jury or prospective jurors, the constitutionality of . . . the manner in which statements were taken from the defendant." Hall opposed the motion, arguing that if his statement to police came into evidence, he "should be allowed to question jurors about what they may feel—what they may feel, coercion, ever been coerced into doing anything—any bias about interactions between officers and particular people in custody. It goes to . . . what credibility they can lend to those types of statements in that type of situation." Other than this argument, Hall failed to identify for the court what he wanted to say about the manner of the interrogation.[2] The court ruled that once a decision had been made that Hall's statement was admissible, "it is not a proper issue to be raised by either side to prospective jurors."

Hall notes that both the United States Supreme Court and we have held that after a district court rules that a defendant's confession was voluntary, the defense may present evidence to the jury on the circumstances surrounding the making of the confession. Hall cites *Crane v. Kentucky*, 476 U.S. 683, 690–91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), in which the Supreme Court unanimously ruled that the defendant's right to present a defense was violated when the trial court excluded competent, reliable evidence bearing on the credibility of a confession—specifically, evidence about the setting in which the con-

---

**2.** He likewise offers no explanation in his brief to this court as to what evidence he would have offered about the manner of his interrogation or how any such evidence would have been relevant.

fession was obtained. The Court noted that the "physical and psychological environment that yielded the confession" can be relevant to determining the defendant's guilt or innocence. *Id.* at 689, 106 S.Ct. 2142. In other words, credibility is a different question than voluntariness. *Id.* Minnesota law is consistent with *Crane.* See *State v. Wajda,* 296 Minn. 29, 31, 206 N.W.2d 1, 2 (1973) (holding that if the district court admits a defendant's statement, the district court "must permit the jury to hear evidence on the circumstances surrounding the making of the confession ... for a determination of weight and credibility").

The rationale of *Crane* does not seem to apply to this case. In *Crane,* the defendant was a minor who testified that he was badgered into making a false confession while surrounded by up to six police officers in a windowless room over a long period. 476 U.S. at 685, 106 S.Ct. 2142. Here, by contrast, Hall did not confess.[3] Moreover, unlike in *Crane,* where the defendant sought to suppress his confession on the grounds that it was unlawfully coerced, 476 U.S. at 684, 106 S.Ct. 2142, the focus of Hall's argument was not that his statement should not have been admitted because it was involuntary. Rather, Hall challenged the *Miranda* warning and also argued that portions of the statement needed to be redacted because of his discussion of his right to counsel and his prior criminal record.

But we need not reach the issue of whether *Crane* applies in the circum-

stances presented here because even if the district court could be said to have erred in limiting Hall's ability to explain the circumstances of the interrogation, any such error is harmless. On appeal, Hall's argument focuses on the State's ability to use Hall's statement for impeachment purposes. For example, Hall notes that the State repeatedly referenced during its cross-examination of Hall that Hall never claimed to have shot Moore in self-defense during his custodial interrogation. But Hall countered this at trial by claiming that the reason he did not raise self-defense with the officer was because he did not have a lawyer with him during the police questioning. Moreover, Hall's failure to identify the evidence he wanted to introduce regarding the nature of his interrogation undermines his claim that he was prejudiced by the court's ruling. Finally, as noted above, the evidence against Hall was compelling. Under the circumstances of this case, we hold that any error by the district court in limiting Hall's inquiry into the manner in which his statement was taken by police was harmless beyond a reasonable doubt.[4]

### D.

■ We next consider Hall's argument that the district court erred when it denied his motion to preclude the State from referring to Moore as the "victim." Hall argues that the term had no probative value and was prejudicial because it undermined his claim that he shot Moore while acting in self-defense.[5]

3. At least one jurisdiction has noted the inapplicability of *Crane* where the defendant did not confess. See *State v. Sperry,* 267 Kan. 287, 978 P.2d 933, 938 (1999).

4. We apply this harmless error standard because we understand Hall's argument to be that the district court's ruling unconstitutionally infringed his right to present a complete defense.

5. We have not addressed whether the State's reference to a decedent as the "victim" violates a defendant's rights. Other states have considered this question. See, e.g., *Agee v. State,* 544 N.E.2d 157, 159 (Ind.1989) (holding that a prosecutor's repeated use of word "victim," in reference to the decedent in a murder case, was not reversible error, because the word was used only in "an inadvertent manner of speaking as might be done to

The use of "victim" to describe someone like Moore, who had been shot and killed, is not unfairly prejudicial to Hall on this record. There may be a situation in which the reference to "victim" is so overused that it results in unfair prejudice to a defendant and therefore constitutes an abuse of the broad discretion vested in the district court to rule on evidentiary issues, but that is not this case. *See Rairdon v. State*, 557 N.W.2d 318, 323 (Minn.1996) (noting that appeals "to the passions and prejudices of the jury by encouraging a conviction based on sympathy for the victim" are improper). The prosecutors' references to Moore as "Mr. Moore" or "Shawn" far outnumbered their references to him as the "victim." In addition, the district court instructed the jury that statements by the lawyers are not evidence. We presume that jurors follow such instructions. *State v. James*, 520 N.W.2d 399, 405 (Minn.1994). We therefore hold that Hall is not entitled to a new trial because the district court did not preclude the State from describing Moore as the "victim."

### E.

■ We next consider Hall's argument that he should have been allowed to introduce Moore's prior convictions in order to impeach Moore's dying declaration where Moore identified Hall as the person who shot him. The district court allowed Moore's statements, including the statement, "Mike shot me," to be admitted under Minn. R. Evid. 804(b)(2), an exception to the hearsay rule for statements made under a belief of impending death. Hall argues the district court erred by ruling that Hall could not impeach Moore's statements with evidence of Moore's prior convictions. Hall contends he had the right to impeach Moore's out-of-court statement just as if Moore had testified in court.

Traditionally, dying declarations have been considered "open to impeachment and discrediting in the same way as other witnesses," including the introduction of the declarant's criminal convictions. 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1446, at 307–08 (James H. Chadbourn rev. ed. 1974).[6] Hall argues that *State v. French*, 168 Minn. 341, 210 N.W. 45 (1926), allows impeachment of dying declarations. In *French*, we said dying declarations "may be impeached by the same means as any other testimony." *Id.* at 343–44, 210 N.W. at 45. But *French* did not involve the precise issue before us—a defendant's attempt to impeach with prior convictions. Rather, the defendant in *French* was attempting to impeach the dying declaration with an inconsistent statement. *See id.* at 343, 210 N.W. at 45. We need not resolve whether *French* applies in Hall's case because we conclude that even if Hall should have been allowed to impeach Moore's dying declaration, the district court's refusal to let him do so was harmless error.

Hall argues that the error implicates his constitutional right to present a defense and thus can only be harmless when we

characterize any person who had experienced a mishap"); *State v. Wigg*, 179 Vt. 65, 889 A.2d 233, 237 (2005) (holding that district court should have required a testifying police officer to use a more neutral term than "victim" for an 11–year–old sexual assault complainant because the probative value of the term "victim" was outweighed by the danger of unfair prejudice).

6.  Hall cites cases from other jurisdictions that allow impeachment of dying declarations with a victim's prior convictions. *McClendon v. State*, 179 Ark. 998, 18 S.W.2d 1021, 1022 (1929); *State v. Mills*, 80 Conn.App. 662, 837 A.2d 808, 811 (2003); *State v. Henderson*, 362 So.2d 1358, 1363 (La.1978); *Commonwealth v. Moses*, 436 Mass. 598, 766 N.E.2d 827, 831 (2002); *People v. Ricken*, 242 A.D. 106, 273 N.Y.S. 470, 473 (N.Y.App.Div.1934).

are "satisfied beyond a reasonable doubt that if the evidence had been admitted and the damaging potential of the evidence fully realized, an average jury (i.e., a reasonable jury) would have reached the same verdict." *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994) (footnote omitted). Under this standard, the question is whether there is a reasonable possibility that introduction of Moore's prior convictions would have changed the verdict. We conclude that introduction of Moore's prior convictions would not have had that effect.

Hall essentially conceded the point of Moore's dying identification of Hall as the shooter when he admitted during his testimony that he shot Moore. During oral argument, Hall argued that notwithstanding his concession that he shot Moore, Moore's statement that "they *got* me" undermined his theory that he shot Moore in self-defense by suggesting that Hall was lying in wait for Moore. (Emphasis added.) Hall argues that he therefore should have been able to impeach the statement with Moore's criminal history. The jury, however, was aware that Moore had an unsavory background, having heard Hall's police interview statement that Moore "is a huge crack dealer," and the testimony detailing the confrontation history between Moore and Hall. Finally, as set forth above, the physical evidence establishing that Hall did not shoot Moore in self-defense was overwhelming. Based on these factors, there is no reasonable possibility that the jury, presented with Moore's criminal background, would have arrived at a different verdict. We therefore hold that any error was harmless beyond a reasonable doubt.

## II.

We next consider Hall's argument that the district court unduly emphasized the duty to retreat when it gave both a jury instruction on self-defense, which included the duty to retreat, and also a separate instruction that self-defense requires complying with the duty to retreat. Hall argues this latter duty to retreat instruction was excessive because the duty to retreat is an "elaboration" on the third portion of the self-defense instruction and the court's separate instruction on the duty to retreat impermissibly elevated the duty to retreat. He contends that the jury "could easily have been influenced" by this alleged overemphasis on the duty to retreat.

District courts are allowed "considerable latitude" in selecting the language in jury instructions. *State v. Moore*, 699 N.W.2d 733, 736 (Minn.2005). Determining whether a jury instruction should be given "lies within the discretion of the district court and will not be reversed but for an abuse of that discretion." *State v. Hannon*, 703 N.W.2d 498, 509 (Minn.2005).

Hall contends that instructions that accurately cite the law can still be erroneous and cites *State v. Peterson*, 673 N.W.2d 482 (Minn.2004). *Peterson* is inapposite. In that case, the district court did not orally charge the jury with complete instructions on the applicable law. *Id.* at 485. Rather, the court referred the jurors to the written instructions given to them at the beginning of the case, told the jury it would be receiving a complete copy of the instructions in written form, and orally read to the jury the portion of the instructions on the elements of the offenses. *Id.* Notably, the court did not read either the instruction on the defendant's presumption of innocence or the instruction defining the State's obligation of proof beyond a reasonable doubt. *Id.* We held that the court's focus on only the elements during its oral charge "impermissibly elevat[ed] some of the instructions over others." *Id.* at 487. The district court in this case made no such similar error.

Here, the district court orally charged the jury with complete instructions on the applicable law. The court gave an accurate self-defense instruction requiring four conditions, the fourth of which was "no reasonable possibility of retreat to avoid the danger."[7] *State v. Johnson*, 719 N.W.2d at 619, 629 (Minn.2006) (stating the four conditions of self-defense) (quoting *State v. Basting*, 572 N.W.2d 281, 285 (Minn.1997)). In this instruction, the court also told the jury that all four conditions must be met for self-defense to apply, and that it was the State's obligation to prove beyond a reasonable doubt that Hall did not act in self-defense. The court then followed that instruction with the self-defense retreat instruction from CRIMJIG 7.08: "The legal excuse of self-defense is available only to those who act honestly and in good faith. This includes the duty to retreat or avoid the danger if reasonably possible." 10 *Minn. Dist. Judges Ass'n, Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 7.08 (5th ed. 2006). These instructions accurately stated the law, and we cannot say that the court's instructions unfairly emphasized one instruction over the others as in *Peterson*. We hold that the district court was within its broad latitude to determine the proper jury instructions, and thus did not err in instructing the jury.

## III.

■ Finally, Hall argues that "the cumulative effect" of the six errors he cites in his direct appeal requires a new trial. But Hall's case does not resemble the cases he cites where we have ordered new trials. The defendant in *State v. Williams* was deprived of a fair trial because of the cumulative effect of three instances of prosecutorial misconduct. 525 N.W.2d 538, 549 (Minn.1995). In *State v. Post*, the cumulative effect of three errors, including one involving prosecutorial misconduct, was "a reasonable possibility that the result in this case might have been different" had the trial court not committed the errors. 512 N.W.2d 99, 104 (Minn.1994). In *State v. Underwood*, 281 N.W.2d 337, 340 (Minn.1979), this court reviewed a very close factual case. Because there was "a great deal of conflicting testimony and the factual determinations must have been difficult," we concluded that "any error, however small, may have prejudiced defendant." *Id.* at 344. In Hall's case, any possible errors were harmless, and they do not lead to concern about the defendant's

7. The court instructed the jury as follows:

Justifiable taking of a life in defense of self. No crime is committed when a person takes the life of another person, even intentionally, if the defendant's action was taken in resisting or preventing an offense the defendant reasonably believed exposed the defendant to death or great bodily harm. In order for a killing to be justified for this reason, four conditions must be met. First, the killing must have been done in the belief that it was necessary to avert death or great bodily harm. Second, the judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances. Third, the defendant's election to defend must be such that a reasonable person would have made in light of the danger perceived and the existence of any alternative way of avoiding the peril. Fourth, there was no reasonable possibility of retreat to avoid the danger. All four conditions must be met.

The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

The 2006 edition of CRIMJIG 7.05, the edition in effect at the time of Hall's trial, did not include this fourth condition. 10 *Minn. Dist. Judges Ass'n, Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 7.05 (5th ed. 2006). The 2008 edition of CRIMJIG 7.05 contains the fourth condition. 10 *Minn. Dist. Judges Ass'n, Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 7.05 (5th ed. Supp.2008).

848

guilt. As described above, the evidence of Hall's guilt was overwhelming. Even if Hall had been able to exclude his ambiguous request for a lawyer and his reference to a prior assault conviction, describe the circumstances of his interrogation, and impeach Shawn Moore's dying declaration, our careful review of the record convinces us that there is still no "reasonable possibility that the verdict might have been different." *Post,* 512 N.W.2d at 102.

Affirmed.