STATE of Minnesota, Respondent,

v.

Robert Vincent LARSON, Appellant.

No. A05–118.

Supreme Court of Minnesota.

Sept. 2, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, MN, for respondent.

Craig E. Cascarano, Cascarano Law Office, Minneapolis, MN; and Deborah A. Macaulay, Macaulay Law Offices, LLC, St. Paul, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

On April 21, 2004, Robert Larson was indicted for first-degree murder in violation of Minn.Stat. § 609.185(1) (2008), aiding and abetting first-degree murder in violation of Minn.Stat. § 609.05 (2008), second-degree murder in violation of Minn. Stat. § 609.19, subd. 1(1) (2008), and aiding and abetting second-degree murder in violation of Minn.Stat. § 609.05, for his role in the death of Thomas John Cady, Jr. Robert Larson and his sister, Jamie Larson, were both indicted for their involvement in the killing, and they were tried separately.[1] The jury found Larson guilty of first-

1. For purposes of clarity, we refer to Robert Larson as "Larson" and Jamie Larson as "Jamie."

degree murder and he received a mandatory life sentence. Larson filed a direct appeal, but his direct appeal was stayed pending postconviction proceedings. After the district court denied Larson's petition for postconviction relief, Larson's direct appeal was reinstated.

The evidence at trial established that the body of Cady was found on November 28, 2003, in a ditch just off Edgerton Street in Ramsey County. Cady appeared to have been strangled to death using zip strips and the death was ruled a homicide. The zip strip used to strangle Cady had a locking mechanism that allowed tightening, but not release. Cady's truck was located near the crime scene. In investigating Cady's death, police investigators determined that Jamie and Cady were boyfriend and girlfriend at the time of Cady's death.

The investigators also determined that, during the early morning hours of the day of the murder, Larson, Jamie, and Cady went to a hotel to see friends who were at the hotel and using drugs. Larson, Jamie, and Cady first went to the room where Dan Iacarella, who is a cousin of Larson, and two friends, J.S. and D.G., were. D.G. testified that Cady started waving around his gun and that Iacarella pushed the gun away from his face. According to D.G., Jamie and Cady left the room and later Jamie came back alone with Cady's gun. After Jamie came back into the room, D.G. testified that she and Larson discussed possibly putting Cady to sleep with a sedative and then using a zip strip or duct tape on his hands and neck.

J.S. testified that Jamie and Larson said that Cady was in his truck sleeping and that J.S. looked out the window and saw him there. According to J.S.'s testimony, Larson and Jamie were angry at Cady because he "had been hitting Jamie" and they talked about tying him up with zip strips and killing him. After this conversation, Jamie, then Larson, and then Iacarella individually left the room. J.S. testified that Iacarella had zip strips in his truck in the hotel parking lot that night and she believed that Larson obtained zip strips from Iacarella's truck.

Ramon Andujar was in another room of the same hotel. He testified that Jamie came into his room in the early morning hours of November 28. She was angry at Cady for beating her and she had Cady's gun. Andujar testified that he believed Jamie asked Andujar to help her kill Cady because she thought he might want revenge for a recent "incident." During that incident, Cady had pulled a gun on Andujar and demanded $1,400 that Cady claimed Andujar owed to one of Cady's friends. Andujar testified that he told Jamie that he was not interested in getting revenge on Cady. He testified that Jamie said Andujar and Iacarella were "a bunch of pusses" and told Andujar that "her and her brother will take care of it." Andujar testified that Jamie left the room and a few minutes later, he went to try to stop her, but he was unsuccessful. He testified that he saw Jamie and Larson leave the hotel and walk toward the parking lot, and saw Larson pull a zip strip from his sweater and make a choking motion with it.

J.S. testified that she also watched Larson and Jamie leave the hotel. She testified that she saw Jamie driving Cady's truck and Larson getting in the back seat behind Cady, who was sleeping in the front passenger's seat. Another man who had been in the hotel room with Andujar when Jamie came in testified that he saw Jamie get into the driver's side of Cady's truck.

After Jamie left, Andujar testified that he went to the other hotel room and got Iacarella because he thought Iacarella might be able to stop Jamie and Larson. Andujar and Iacarella then got in Andu-

jar's Trailblazer and followed Cady's truck, which Jamie was driving. Andujar testified that, as he was following the truck, he saw Cady appear to "kind of wake up" and face the driver. Around that time, Cady's truck left the highway and Andujar followed it.

Once off the highway, Andujar said he lost Cady's truck briefly when it made a sudden turn. When he took his Trailblazer back to the area where he had lost Cady's truck, he saw Jamie walking toward his Trailblazer and picked her up. Jamie then directed Andujar where to go to pick up Larson. Larson got into the Trailblazer in the back seat behind the driver. Andujar testified that Larson complained that he had "hurt his arm, or his hand, or his ankle." Andujar said he did not look for Cady.

Andujar drove back to the hotel, stopping to drop Jamie off at a White Castle to pick up Larson's truck and stopping at a SuperAmerica for Iacarella and Larson to go inside. Larson got out of the Trailblazer at SuperAmerica and Andujar left Larson there. This portion of Andujar's testimony was corroborated by footage from video surveillance cameras from the White Castle and the SuperAmerica.

Later that morning, Iacarella and then Larson returned to the room where D.G. was staying. D.G. described Larson as "breathing heavy" and said that Larson "had blood on his knuckles and he was washing them." Although Iacarella and Larson told D.G. that Larson had been beaten up by Cady, D.G. testified that there was no sign that Larson had been beaten up.

The State introduced evidence of a number of statements that both Jamie and Larson made following Cady's death, admitting their involvement in the crime. Shortly after the killing, Jamie stopped by the apartment of J.H., whom she had re-

cently become romantically involved with, and told him "she had taken care of [Cady]." J.H. testified that he saw Larson that same day and Larson told J.H. that "he had put a zip strip around [Cady's] neck and he had pulled it tight, and . . . [Cady] woke up and jumped out of the truck, and [Larson] went out after him." Jamie also told J.S. more details about the killing. J.S. testified that Jamie said "when they were driving that [Larson] slipped the zip strip around [Cady's] neck to scare him, and then [Cady] woke up and there was a struggle, and somehow they fell out of the truck."

In addition to the testimony of the various witnesses, the State also introduced forensic evidence corroborating the testimony of the witnesses and linking Larson to Cady's murder. The State introduced evidence that Larson's DNA was extracted from blood found on the inside door handle of the rear driver's side door of Andujar's Trailblazer. This corroborated Andujar's testimony that when he picked Larson up from the roadside, Larson climbed into the back seat behind the driver. The State also presented evidence of fingerprints within Cady's truck that were consistent with J.S.'s testimony that Jamie entered the driver's door and Larson entered the back seat passenger's door. The State also introduced evidence that Larson's hands were badly scratched and that these injuries were consistent with the scratches that would be anticipated from applying enough force to the locking mechanism of a zip strip to strangle someone. Moreover, the injuries on Cady's body were consistent with falling out of a moving vehicle, lending credence to the reports by J.H. and J.S. of Jamie and Larson's descriptions of the killing.

At trial, Larson presented two witnesses. The first was Larson's employer who testified that it would have been possi-

ble for Larson to have scratched his hands laying carpet tack for his job. The second was a crime and intelligence analyst who worked for the prison where Iacarella was being held. The analyst testified that she had listened to a phone call Iacarella made from jail to an unknown man in which Iacarella seemed to suggest that if he had told investigators something, he would have been "out for free." The number Iacarella called was the same number J.H. had given earlier at trial as his. Larson argued that this testimony supported the inference that J.H. and Iacarella could have been concealing information about their own involvement in the crime. Larson also attempted to undermine the State's case by attacking the credibility of the State's witnesses. Specifically, Larson used prior inconsistent statements that both Andujar and D.G. made to police investigators to impeach their credibility and suggested that the heavy drug use by the State's witnesses may have impaired their memories.

Furthermore, Larson, both in cross-examination and closing, suggested that Andujar and Iacarella might be alternative perpetrators. In closing argument, Larson suggested that both Andujar and Iacarella were plausible alternative perpetrators because they had the opportunity to commit the murder. Larson also suggested that the State's witnesses were dependent on Andujar and Iacarella for drugs and so these witnesses would be reluctant to implicate Andujar and Iacarella.

To bolster the alternative perpetrator theory, Larson tried to establish that the State's investigation of alternative perpetrators was lacking. During cross-examination, Larson questioned Andujar, J.H., and C.F.[2] on whether the police had taken DNA samples from them, and the witnesses said yes. In closing, Larson pointed out that the police never ran tests on the samples and suggested that the failure to do so showed a failure to fully investigate all suspects. The State attempted to rebut these implications by arguing that the witnesses had given their DNA samples voluntarily. Larson did not object at trial to the State's questioning as to whether the suspects gave DNA samples voluntarily, but now argues on appeal that the State, by referring to the fact that some suspects gave DNA samples voluntarily, created an impermissible inference that Larson refused to give his DNA sample voluntarily.[3]

The jury found Larson guilty of first-degree murder. On appeal, Larson argues that the district court committed reversible error in denying his motion for a continuance, that the State violated his right to due process through its presentation of evidence regarding DNA samples obtained from Larson and others, and that the district court made erroneous evidentiary rulings that deprived him of the opportunity to present a defense. We consider each argument in turn.

I.

We first address Larson's argument that the district court abused its discretion in refusing to grant a continuance so that additional DNA testing could be completed. Generally speaking, "[t]he decision to grant or deny a continuance lies within the discretion of the district

---

2. C.F. was a friend of Cady's, and Cady had been staying with him at the time of the murder.

3. Larson, however, *did* object to the State introducing evidence that Larson's DNA was obtained pursuant to a search warrant. Larson also argues on appeal that this contributed to creating an impermissible inference that Larson refused to submit to DNA testing without a warrant.

court" and we "will not reverse the court's decision unless the defendant shows that the denial of a continuance prejudiced him by materially affecting the outcome of the trial." *State v. McLaughlin,* 725 N.W.2d 703, 713 (Minn.2007). Larson points out that the police obtained DNA evidence from three potential suspects—C.F., Andujar, and J.H.—shortly before trial. Testing was never completed on the DNA samples, however, and Larson argues that district court erred in declining to grant a continuance of the trial so that additional DNA testing could be completed. We disagree.

Our careful review of the record confirms that the denial of the continuance did not materially affect the outcome of the trial. Deputy Gibbs testified that the police obtained the DNA of C.F., Andujar, and J.H. on September 29, 2004, because there was an unknown male DNA profile on two Marlboro Light cigarette butts in Cady's ashtray and a jacket found at the intersection near the crime scene. Gibbs testified that he subsequently determined that the cigarette butts and jacket belonged to C.F., a friend of Cady's who was a frequent passenger in Cady's truck and whom Cady had been living with at the time. The police therefore concluded that the DNA on the cigarette butts and jacket was almost certainly C.F.'s. C.F. himself testified that the cigarette butts and jacket belonged to him.

Given that the investigators determined the likely contributor of DNA on the items in question without DNA testing and given that C.F. provided a reasonable explanation for why items belonging to him might be found in or near Cady's truck, Larson has not shown additional DNA testing would have materially affected the trial. We therefore hold that the district court did not abuse its discretion when it denied Larson's request for a continuance.

## II.

We next address Larson's argument that the State used Larson's refusal to voluntarily submit to DNA testing as evidence of guilt, which violated his due process right to a fair trial. There are two parts to Larson's due process argument. First, Larson argues that the State's elicitation of testimony that other witnesses voluntarily submitted to DNA testing created an impermissible inference that Larson had refused to give a DNA sample voluntarily. Second, Larson argues that the State inappropriately commented upon Larson's refusal to consent to DNA testing.

■ We have explained that the "[t]he district court has 'broad discretion' when it comes to the admission of evidence" and we "will upset such rulings only if it can be said that the [district] court abused its discretion." *State v. Hall,* 764 N.W.2d 837, 841 (Minn.2009) (quoting *State v. Hooper,* 620 N.W.2d 31, 38 (Minn.2000)). Larson has the burden to show that the district court erred and that he suffered prejudice as a result of the evidentiary error. *See id.* If there was error of constitutional dimension, a new trial will be awarded unless the error is harmless beyond a reasonable doubt. *See id.* at 842. With these principles in mind, we consider each of Larson's arguments relating to the DNA evidence.

## A.

■ Larson argues that the district court erred in allowing the State to make repeated references to other witnesses' willingness to give DNA samples voluntarily. Specifically, Larson contends that these references allowed the jury to draw the impermissible inference that he had refused to consent to such testing. But Larson himself opened the door to the

testimony at issue by examining the witnesses as to whether and when the State had taken DNA samples from them. *Cf. State v. Jones*, 753 N.W.2d 677, 687 (Minn. 2008) ("But the alternative perpetrator defense opens the door for the prosecutor to present testimony exculpating the alleged alternative perpetrators.").

Larson, not the State, made the first mention at trial of DNA testing of other suspects when Larson asked Andujar if the police had taken a DNA sample from him just a few weeks before the trial. Larson used this information to suggest that the police investigation had not been particularly thorough because the police did not take DNA samples from Andujar and several other witnesses until September 2004. Larson raised the issue again in a similar fashion during the cross-examination of J.H. In response to Larson's questioning, the State asked J.H. on redirect examination if he voluntarily gave a DNA sample and clarified that the State did not need to get a search warrant to get it from him. Later in the trial, the State also asked Deputy Gibbs a series of questions about whether various witnesses had voluntarily given DNA samples. The State asked specifically about Andujar, J.H., and C.F. Given that the question of how the DNA evidence of other suspects was obtained did not become an issue at trial until Larson opened the door for such testimony by questioning various witnesses on whether the State had taken a DNA sample and implying that the State had not been thorough in its investigation of alternative perpetrators, we hold that the district court did not abuse its discretion in allowing such evidence, which was potentially exculpatory for the alternative perpetrators, to be introduced. *See id.*

### B.

■■ Larson also argues that his due process right to a fair trial was violated because the State was allowed to introduce evidence that he had refused to submit to voluntary DNA testing, and that the State used his refusal as evidence of his guilt. It is uncontested that Larson refused to allow the police to take a saliva sample to obtain his DNA until the police produced a warrant. At trial, the district court ruled, over Larson's objection, that Larson's refusal to submit voluntarily to DNA testing could come before the jury. The court acknowledged that, while Larson "had that right to refuse to cooperate," he did not see that "any constitutional rights of [Larson's] are violated by that fact being told to the jury." This ruling was erroneous. *See Jones*, 753 N.W.2d at 687 ("It is a violation of the defendant's right to due process for a prosecutor to comment on a defendant's failure to consent to a warrantless search.").

■ The State notes that although the district court ruled that evidence of Larson's refusal to voluntarily submit to DNA testing was admissible, this evidence never came before the jury. In essence, the State argues that any error from the court's ruling was harmless. *See Hall*, 764 N.W.2d at 842; *State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn.2003) ("For constitutional error ... the inquiry is whether the guilty verdict actually rendered was surely unattributable to the error."). To determine whether a constitutional evidentiary error is harmless beyond a reasonable doubt, we look to "the 'manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, ... whether it was effectively countered by the defendant,' and the strength of the evidence of guilt." *Hall*, 764 N.W.2d at 842 (quoting *State v. Al–Naseer*, 690 N.W.2d 744, 748 (Minn.2005)).

With respect to the manner in which the erroneous evidence was presented, the State rightly notes that it did not directly comment on Larson's refusal to volunteer his DNA. But the State did indirectly comment on Larson's refusal by emphasizing in its questions that Larson was "compelled" to give a DNA sample. In particular, in examining a deputy, the State asked whether "you and other deputies sought a court order to compel the defendant to give DNA." Later in the same series of questions, the State highlighted this point again by asking, "when you were executing the search warrant on the person of the defendant, Robert Larson, in addition to the search warrant compelling him to give DNA, did it compel anything else?" The State did not, however, mention Larson's refusal to volunteer his DNA during its closing argument, or argue that Larson's failure to submit to DNA testing voluntarily was indicative of his guilt.

Moreover, Larson attempted to counter to some extent any negative inference from the State's questions regarding Larson being compelled to provide his DNA by asking the police chief who arrested Larson to acknowledge that a person has "the absolute constitutional right" to choose not to speak with the police when they show up at his door. The chief agreed that a person has this right.

Finally, there was other extensive evidence connecting Larson to the commission of the crime. Specifically, the State presented multiple witnesses who testified that Larson and Jamie left in a truck with Cady in the early morning hours of November 28 after discussing their intention to kill or hurt Cady with several people at the hotel, and the State presented two witnesses who testified as to confessions Larson and Jamie made after the crime. One State witness, Andujar, testified to following Larson and Jamie as they drove Cady's truck and picking them up near the crime scene shortly after the killing likely took place. Also, forensic evidence largely corroborated witness testimony as to Larson's role in the crime, including evidence that Larson's hands bore marks that closely corresponded to the injuries that would be expected from using a zip strip to strangle someone to death.

Based on this analysis, we conclude that the verdict was surely unattributable to the error of the district court's ruling. We therefore hold that any erroneous admission of evidence of Larson's refusal to submit to DNA testing voluntarily was harmless beyond a reasonable doubt.

### III.

Larson argues that the cumulative effect of the district court's evidentiary rulings deprived him of the opportunity to present a reasonable defense. Specifically, Larson argues that the district court abused its discretion when the court (1) did not allow Larson to present alternative perpetrator evidence to the jury; (2) denied Larson's motion to require the police officers to review defense-prepared transcripts of police interviews; and (3) allowed the introduction of co-conspirator statements in violation of his rights under the Confrontation Clause. We evaluate Larson's arguments regarding each of these evidentiary rulings in turn.

### A.

We first address Larson's argument that the district court prevented him from introducing alternative perpetrator evidence that would have implicated other suspects in the case and that the court's exclusion of this evidence denied him his constitutional right to present a complete defense. We have recognized that "[a]lternative-perpetrator evidence is admissible if it has an inher-

ent tendency to connect the alternative party with the commission of the crime." *State v. Vance*, 714 N.W.2d 428, 436 (Minn.2006). But "[p]roper foundation must be laid for the admission of such [alternative perpetrator] evidence" in order "to avoid the consideration of matters collateral to the crime." *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn.1977). Larson argues that the district court prevented him from effectively introducing alternative perpetrator evidence regarding Andujar and Iacarella. Our review of the record, however, confirms that much of the evidence Larson cites as important third-party perpetrator evidence was in fact introduced at trial.

With respect to Andujar, the jury heard that Andujar was present at the hotel the night in question and was in close proximity to the crime scene at the time of the murder. Moreover, Andujar testified as to an earlier incident in which Cady pulled a gun on him and demanded that Andujar pay $1,400 that he supposedly owed to one of Cady's friends.

Regarding Iacarella, the jury heard that he was present at the hotel on the night in question and close to the crime scene at the time of the murder. The jury also heard testimony that Cady was "waving" his gun around the hotel room on the night of the murder and that Iacarella had pushed it out of his face when Cady waved it at him. The jury also heard testimony that Jamie and Larson had started talking about using zip strips to tie Cady up in the hotel room and that, after having this discussion, Jamie, Larson, and Iacarella all left the hotel room individually in short succession. It was also suggested multiple times at trial that Iacarella had been the source of the zip strips used in the murder.

Moreover, the district court specifically ruled that both Andujar and Iacarella were

potential third-party perpetrators, and Larson presented this theory to the jury. In closing, Larson referred to both Andujar and Iacarella as drug dealers and suggested none of the witnesses wanted to implicate them in the murder because Andujar and Iacarella were their primary suppliers of drugs. Larson also highlighted the fact that Andujar and Iacarella were on Edgerton Street near the site of the crime on the night in question and suggested that the police had been lax in their investigation of these two men. Moreover, Larson implied Iacarella could have been the perpetrator by pointing out that witnesses had described seeing someone in a hat standing by the side of the road near the murder scene and that Iacarella could be seen wearing a hat in the SuperAmerica video on the morning of the murder.

■ The only alternative perpetrator evidence related to Andujar or Iacarella that Larson argues should have been admitted at trial, but was not, is evidence about various rumors that Andujar wanted to kill Cady. But Larson does not cite any place in the record where he attempted to introduce such evidence and was not permitted to do so and therefore it is unclear that the issue was preserved for appeal. *See* Minn. R. Evid. 103(a)(2); *State v. Lee*, 494 N.W.2d 475, 479 (Minn.1992) ("[D]efendant did not properly preserve the claimed errors for review by making an offer of proof showing the nature of the evidence excluded so that courts on appeal could determine if it was error to exclude the evidence and whether the error, if any, was prejudicial."). Even if Larson had tried to introduce such evidence, it could have been excluded as not relevant or as hearsay. *See Vance*, 714 N.W.2d at 442 (determining that alternative perpetrator evidence of a rumor regarding a suspect's involvement in a robbery was inadmissible

hearsay and therefore did not have an inherent tendency to connect the alternative perpetrator to the crime); *Hawkins,* 260 N.W.2d at 159 (explaining that proper foundation must be laid for admission of alternative perpetrator evidence). We hold that the district court committed no errors with respect to the rumor evidence.

 In addition to his arguments regarding Andujar and Iacarella as alternative perpetrators, Larson also makes a more general argument that other alternative perpetrator evidence was improperly excluded from trial. But Larson has not met his burden of establishing the relevance of any additional proposed evidence related to alternative perpetrators. While he lists other parties that had conflicts with Cady in his brief, Larson made no showing that any of this evidence had "an inherent tendency to connect the alternative party with the commission of the crime." *Vance,* 714 N.W.2d at 436; *State v. Richardson,* 670 N.W.2d 267, 280 (Minn. 2003) (explaining a defendant should not "be allowed to throw strands of speculation on the wall and see if any of them will stick" (citation omitted) (internal quotation marks omitted)); *see also Hawkins,* 260 N.W.2d at 159 ("[E]vidence tending to incriminate another is inadmissible in the absence of proof of facts to connect that person with the crime."). Accordingly, we hold that the district court did not improperly exclude any alternative perpetrator evidence.

### B.

 We next address Larson's argument that the district court abused its discretion in denying his motion to require the State to authenticate Larson-prepared transcripts of police interviews. During the investigation of Cady's murder, many of the police interviews with witnesses were tape-recorded. Larson had the in-terviews transcribed and wanted to use the transcripts for impeachment purposes at trial. The State objected on the grounds that there was no time to authenticate them before the trial and that their use was unnecessary given the other evidence available. Specifically, the State argued that Larson could effectively impeach witnesses without the transcripts using either the police reports taken from interviews with the witnesses or the actual tape recordings of the interviews. Larson disagreed, arguing that he could not impeach the witnesses with their prior inconsistent statements without the transcripts. The district court denied Larson's motion to require the police officers to review the transcripts prepared by the defense because there was no requirement that the officers create or review such transcripts and there were ample other ways for Larson to impeach the witnesses.

We need not decide in this case whether the district court erred in declining to order the police to authenticate the defense's transcripts of the interviews with witnesses. *Cf. State v. Graham,* 764 N.W.2d 340, 355 (Minn.2009) ("Ideally, a transcript of C.H.'s interview should have been prepared by the State, or, alternatively, the transcript made by defense counsel should have been provided to the State for verification, or the district court should have either ordered the State to verify the relevant parts of the transcript or permitted introduction of the tape."). We do not have to reach this issue because Larson had ample opportunity to impeach the witnesses with the police reports, and he did so effectively. For example, during cross-examination, Andujar admitted that he repeatedly lied to police. He admitted that he denied driving the Trailblazer, denied following Jamie the night of the murder, denied picking up Larson, and even denied being who he was. Moreover, Lar-

son had access to the actual tape recordings of the witnesses' interviews with the police, which were the best evidence of the conversations in this case. *See State v. Swanson,* 498 N.W.2d 435, 438–39 (Minn. 1993) (explaining that the admission of tape recordings is preferable to solely admitting transcripts of those tape recordings). Finally, Larson has not demonstrated that the transcripts would have provided impeachment opportunities that were not equally available to him through use of the tape recordings and the police reports. Because Larson had other information available from which to impeach the witnesses, we hold that any error regarding the transcripts was harmless.

## C.

■ Larson argues that the district court violated his rights under the Confrontation Clause when it allowed the State to proffer as evidence of Larson's guilt co-conspirator nonhearsay statements of declarants who were available to testify. The district court issued an order permitting the State to introduce testimony regarding discussions between Larson and Jamie and statements made by Jamie and Iacarella as substantive evidence on the grounds that it was co-conspirator non-hearsay. In order to admit out-of-court statements as co-conspirator nonhearsay, two things must be shown. First, the

statements must satisfy the requirements of Minn. R. Evid. 801(d)(2)(E).[4] Second, the introduction of the statements must not violate the Confrontation Clause of the Sixth Amendment. U.S. Const. amend. VI.

■ Larson argues that the admission of co-conspirator statements violated his rights under the Confrontation Clause. For a statement to implicate the Confrontation Clause, it must be testimonial. *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("[T]he framers would not have allowed the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."). We have explained that "statements made to non-government questioners who are not acting in concert with or as agents of the government are considered nontestimonial." *State v. Moua Her,* 750 N.W.2d 258, 265 (Minn. 2008), *vacated on other grounds,* —— U.S. ——, 129 S.Ct. 929, 173 L.Ed.2d 101 (2009). The co-conspirator statements introduced at Larson's trial arose in discussions amongst friends and acquaintances, not during police interrogations, and were not made for the purpose of establishing facts potentially relevant for a future criminal prosecution. These statements therefore are not testimonial and their ad-

---

4. Minn. R. Evid. 801(d)(2)(E) provides:

[A] statement by a coconspirator of the party. In order to have a coconspirator's declaration admitted, there must be a showing, by a preponderance of the evidence, (i) that there was a conspiracy involving both the declarant and the party against whom the statement is offered, and (ii) that the statement was made in the course of and in furtherance of the conspiracy. In determining whether the required showing has been made, the Court may consider the declarant's statement; provided, however, the declarant's statement alone shall not be

sufficient to establish the existence of a conspiracy for purposes of this rule. The statement may be admitted, in the discretion of the Court, before the required showing has been made. In the event the statement is admitted and the required showing is not made, however, the Court shall grant a mistrial, or give curative instructions, or grant the party such relief as is just in the circumstances.

Larson does not argue that the admission of co-conspirator statements at his trial violated Rule 801(d)(2)(E), and so we do not consider this issue further.

mission does not implicate Larson's confrontation rights. *See Crawford,* 541 U.S. at 56, 124 S.Ct. 1354 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy."); *United States v. Singh,* 494 F.3d 653, 658 (8th Cir.2007) ("Further, our court has held that co-conspirators' statements made in furtherance of a conspiracy and admitted under Rule 801(d)(2)(E) are generally non-testimonial and, therefore, do not violate the Confrontation Clause as interpreted by the Supreme Court."); *Her,* 750 N.W.2d at 264–65 & nn. 5–6 (explaining that non-testimonial statements do not implicate the Confrontation Clause of either the state or federal constitution). Accordingly, we hold that the district court did not err in admitting these statements.

Affirmed

Concurring, PAGE and ANDERSON, PAUL H., JJ.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (concurring).

I concur in the result, but I write separately to note my disagreement with the court's conclusion that the admission of evidence that Andujar, J.H., and C.F. voluntarily gave DNA samples was not error. On the unique facts of this case, that evidence was more prejudicial than probative and should have been excluded.

Although we have said that by introducing alternative-perpetrator evidence a defendant opens the door for the prosecutor to present testimony exculpating the alleged alternative perpetrators, including evidence that the alleged alternative perpetrators voluntarily provided DNA

that exculpated them, we specifically noted that we had reservations about the prosecutor's emphasis on the fact that the DNA samples were voluntarily produced rather than simply stating that such samples had been produced and exculpated the suspects. *State v. Jones,* 753 N.W.2d 677, 687 (Minn.2008).

Here, the State not only emphasized the fact that the alleged alternative perpetrators' DNA samples were voluntarily produced, the State also introduced and emphasized evidence that Larson's DNA sample was compelled. While the court correctly concludes that it was error to allow evidence that Larson's sample was compelled, the court ignores the fact that this error is exacerbated by the State's exploitation of the fact that the alleged alternative perpetrators' DNA samples were obtained voluntarily.

While I conclude that the testimony about how the alleged alternative perpetrators' DNA samples were obtained was admitted in error, I nonetheless conclude that the error was harmless because it likely did not have a substantial effect on the jury's verdict. *See State v. Wren,* 738 N.W.2d 378, 390 n. 8 (Minn.2007).

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Page.