STATE of Minnesota, Respondent,

v.

Jerome Emmanuel DAVIS, Appellant.

No. A10–0731.

Supreme Court of Minnesota.

Sept. 19, 2012.

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Suzanne M. Senecal–Hill, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

Appellant Jerome Emmanuel Davis was convicted of aiding and abetting first-degree felony murder for the shooting death of Armando Calix. Minn.Stat. §§ 609.185(a)(3), 609.05 (2010). The district court sentenced Davis to life in prison. On appeal, Davis claims that numerous errors entitle him to a new trial. We disagree, and therefore affirm Davis's conviction.

Armando Calix bled to death on the lawn outside of his apartment shortly after being shot in the neck at about 8:00 p.m. on May 11, 2007. The investigation of Calix's death led the police to believe that either Davis or his accomplice, Toriano Dorman, killed Calix while committing an aggravated robbery. After a jury trial in which the following facts were established, Davis was convicted of aiding and abetting first-degree felony murder.

*Events Leading Up to Calix's Murder*

The day before the murder, May 10, 2007, Davis made inculpatory statements during a telephone conversation with his friend, Anthony Whigham. The conversation was recorded because Whigham was an inmate at the Hennepin County Jail. During the phone call, Whigham asked,

"What is going down with you," to which Davis responded, "Fucked [up,] about to rob somebody." When Whigham asked if he was serious, Davis replied, "Hell yeah." Davis then told Whigham that he had purchased a "bubble"[1] because his old car had been stolen. Later, Whigham implied that he wanted Davis to give him money to hire a lawyer. Davis responded that he did not currently have any money but that a white woman was trying to line up a $10,000 "lick"[2] for him. Davis told Whigham that if the lick went well, he would give Whigham $1,500 for a lawyer. Immediately after the discussion of the planned robbery, Davis asked Whigham for Jovan Gentle's telephone number.

Jovan Gentle contacted Davis during the afternoon of May 11, 2007. Gentle wanted to meet and talk to Davis about getting back Gentle's watch—a watch that Davis had sold to another friend. Davis agreed to meet, and they met at or near 36th Street and Portland Avenue in south Minneapolis. Gentle came to the meeting in his car, and Davis arrived in a "four-door, blue Caprice," or "bubble." According to Gentle, Davis had two passengers: a person he identified as "Fifty," and Toriano Dorman. As soon as Davis and Gentle arrived, they got out of their cars and started arguing about the watch. During the argument, Dorman got out of Davis's car "clenching" a revolver in an apparent attempt to defend Davis, but Davis ordered Dorman back inside the car. After the argument, Davis and Gentle got back in their cars and drove toward 31st Street. Gentle then drove home.

Sometime later, Gentle received a telephone call from Davis. Davis asked Gen-

---

1. "Bubble" is a term sometimes used to describe a Chevrolet Caprice.

2. "Lick" is a slang term for robbery.

tle to meet him on 31st Street and Pleasant Avenue to help with a robbery. While Gentle initially told Davis that he would help, he later changed his mind and stayed at home.

Cell phone records showed that Dorman and Davis, and Dorman and Calix, were in contact with each other on the day of Calix's murder. The police discovered that Calix had made and received numerous calls to and from a phone associated with Dorman throughout the day of the shooting. The last call to Calix from Dorman's phone was made at 8:01 p.m., and was routed through a cell tower a few blocks from the crime scene. Phone records also revealed that there were seven calls between Dorman's cell phone and one of Davis's cell phones earlier in the day.

In addition to the cell phone record evidence, the State also introduced testimony from B.B., who placed Davis and Dorman at the crime scene just minutes before Calix's death. Shortly before 8:00 p.m., B.B. noticed Davis and Dorman walking across the yard of 3043 Grand Avenue South. B.B. recognized them because he had seen them on many occasions. According to B.B., Davis and Dorman hesitated in the yard momentarily, and then went through a hole in a fence to the apartment building next door, 3044 Pleasant Avenue (Calix's apartment building). While they were going through the fence, B.B. saw Davis holding something on his side to stop it from catching on the hole in the fence. Davis and Dorman then entered Calix's apartment building. Just after Davis and Dorman entered the apartment, B.B. got into his car to leave, but due to traffic congestion, he was unable to leave. About 3 minutes after he got into his car, B.B. heard a gunshot and called 911.

*The Crime Scene*

Minneapolis police officers Steven Manhood and Jeffrey Egge responded to the crime scene less than 2 minutes after B.B. called 911. The officers found Calix lying in a pool of blood in front of the 3044 Pleasant Avenue apartment building. Officer Manhood checked Calix for a pulse but did not find one. When other officers arrived, Manhood and Egge followed a trail of blood into Apartment 2 of the 3044 Pleasant Avenue building. After checking the apartment for other victims, suspects, and weapons, police sealed the apartment until a search warrant could be obtained.

After obtaining a warrant, the police searched Apartment 2. They found a bullet hole in a window and bullet fragments near the window. They also found a knife on the ground with Calix's blood on it. The police swabbed the door knobs from the main door to the apartment and an interior closet door for DNA and fingerprints, but these swabs did not render meaningful results.

The medical examiner pronounced Calix dead at the scene. Later, an autopsy revealed that Calix died from one gunshot wound to the neck.

*Events Following Calix's Murder*

About 20 to 30 minutes after calling Gentle to ask for help in the robbery, Davis called Gentle again and informed Gentle that he was behind Gentle's house. Gentle went outside to meet Davis and knew that something was wrong because Dorman and Davis looked "paranoid." Gentle noticed that Davis, Dorman, and a woman Gentle knew as "Coco," were all in Davis's Caprice.

Davis got out of his car, opened the trunk, and told Gentle that he "hit the lick on a Mexican." Gentle testified that the trunk contained between 15 to 20 pounds of marijuana in a green tub that Dorman

and Davis had taken in the robbery.[3] After showing Gentle the marijuana, Davis asked Gentle to follow him to his house in Saint Paul. Gentle obliged. Once they arrived at Davis's house, Davis and Gentle went to the basement and Dorman and Coco left.

While in the basement, Davis told Gentle details about the robbery and shooting. Davis said that when he and Dorman entered the apartment, "the Mexican was sitting on the chair [but when Davis] raised the gun up and the Mexican jumped up off the chair, he shot him one time in the chest." After he shot the victim, Davis said that he ran out of the house, jumped in his car, and immediately came to Gentle's house. Davis also showed Gentle two guns: a .357 revolver and a .44 revolver. Gentle told Davis that Davis needed to get rid of the guns. Because they planned to sell the marijuana that Davis had stolen, the two decided to buy some baggies.

While they were driving, separately, across a bridge to a store to get baggies, Gentle saw Davis slow down and throw something out of the window of his car. At the store, Davis told Gentle that he had thrown the guns out of his window into the Mississippi River. After purchasing baggies, the two went back to Davis's house and began dividing up the marijuana. Davis gave Gentle 3 or 4 pounds of it, and Gentle left.

After the murder, Davis made more inculpatory statements during the phone calls with Whigham. On May 12, 2007, the day after the murder, Davis received a brief phone call from Whigham. When asked how it was going, Davis told Whigham that it was "all bad," but that he did not want to talk about it over the phone.

Davis also confirmed that "something went down" that was "real serious."

The next day, Whigham made another call to Davis. Davis indicated that "some shit happened" during the robbery but that he could get Whigham money as soon as what he stole got "turned into money." Then Davis described the robbery in more detail, stating: "I told you already. I told you I had something to line up to happen but ... it ain't go as smoothly as I wanted it to go and somebody had to you know what I am saying." Davis then clarified, *"somebody had to go and it wasn't me."* (Emphasis added.)

The final call from Whigham to Davis occurred on May 13, 2007. During this call, Davis told Whigham that he was nervous that his situation was on the news. Davis also indicated that he needed to "move real easy now" by taking rides, implying that it was not safe to drive his car.

A few days after the murder, Davis called Gentle and asked him to come retrieve the marijuana out of Davis's house because Davis was worried that the police were looking for him. Davis was worried because he thought that the police may have traced his phone during his conversations with Whigham. Gentle went to Davis's house, and Davis gave him the rest of the marijuana in the green tub. According to Gentle, Davis wanted him to either sell or store the drugs.

*Davis's Arrest, Interrogation, and Statement*

Davis was arrested on May 18, 2007, for an unrelated assault. After Davis was arrested, Davis called Gentle several times. Talking in "code," Davis repeatedly asked Gentle for money so that he could bail out

---

**3.** Gentle's girlfriend later turned this tub over to the police and the State introduced it as an exhibit at trial.

of jail before the homicide detectives figured "out what was going on."

On the day Davis was arrested, Minneapolis Police Officer Christopher Karakostas interrogated Davis about the Calix shooting. After confirming Davis's identity and informing Davis that he had been arrested for an assault, Karakostas informed Davis of his *Miranda* rights. Davis indicated that he understood his rights and Karakostas then questioned Davis about the assault.

After a few minutes, Karakostas turned his attention to the Calix shooting. Karakostas asked Davis several times about the last time he had been in south Minneapolis, and Davis responded that he had not been to south Minneapolis in at least two weeks. Karakostas then asked Davis where he was on the night of May 11. Davis told Karakostas that he was in his house in Saint Paul. After Karakostas tried to nail down what Davis meant, Davis began to worry out loud that he was not being questioned solely about an assault. Karakostas then told Davis that he was arrested for the assault but that his name had "come up in something else too." Davis then asked Karakostas if he could go home after the interrogation. Karakostas replied in the negative, telling Davis that he was going to jail after the interview for the assault and that he was "getting [himself] kind of jammed up on something" else, as well.

After hearing this, Davis got visibly agitated and said, "[o]kay can ya'll just send me. I don't know about nothing that's going on. You talking to me, you won't tell me nothing's going on. I don't know, can you just send me to jail then 'cause I don't know." Karakostas then attempted to clarify what Davis meant by "I don't know," and Davis responded that he did not know anything about the assault.

Davis then repeated that he wanted to go to jail for the assault.

After Karakostas again asked Davis where he was on May 11, Davis stated, "I just told you where I was sir. Can, now can I go to jail. I don't want to talk. I don't want to talk. I don't know where ya'll getting to with I done [and] I'm here back in jail again." Karakostas stated that whether Davis wanted to talk was up to Davis, but that Davis probably did want to talk to the police. Davis then said he did not want to go to jail because he had not done anything wrong.

Karakostas continued probing for information about Calix's death. Karakostas asked Davis more questions about Davis's location on May 11, told Davis that he knew Davis was involved in something that happened at 31st Street and Pleasant Avenue, and implied that Davis had been identified. Davis repeated that he wanted to go to jail for the assault. Specifically, Davis said, "[T]ake me to jail.... I don't, you can cut that off, I don't have nothing to say. 'Cause I ain't done nothing. I didn't assault nobody ... I don't know nothing about that." Karakostas immediately responded, "[O]kay, we're gonna end this now if that's what you want. You just got [to] make sure that's really what you want Jerome." Karakostas then asked Davis if he wanted to keep talking, and Davis responded, "I don't want to talk. Take me [to jail] for this assault that you saying I did. I done did, I didn't do no assault."

Karakostas then said, "[O]kay, alright we'll do that. [I will] give you my card though. If you change your mind in jail give me a call okay, 'cause chances are you're going to change your mind." Karakostas then gave Davis his business card, closed his notebook, picked up his keys from the table, and moved toward the door. But Davis then said, "[H]omicide

unit . . . you got me in a homicide?" Karakostas then asked Davis if he wanted to keep talking. Davis responded by asking questions about why he was going to jail. After Karakostas revealed more information about what the police knew about Davis's involvement in the events of May 11, Davis stated, "My rights says anything I say can and will be used against me in the court of law. So if I tell you the truth or anything it is gonna be used against me in a court of law so I don't . . . so what's my point of talking to you?"

Davis then said, "I might as well talk to a lawyer, somebody who can help me." After clarifying that Davis did, in fact, want to have an attorney present for questioning, Karakostas ended the interrogation and stated, "All right sit tight. If you need anything knock on the door." Before leaving the room, Davis asked Karakostas if Karakostas would bring him a glass of water. About 7½ minutes later, Karakostas returned with a glass of water and told Davis that it "shouldn't be too much longer" before his attorney arrived. Davis then made motions indicating Karakostas should stay in the room, and told Karakostas to close the door.

For approximately the next half hour, Davis repeatedly asked Karakostas if he could go home if he told Karakostas what he knew. Karakostas told Davis that he would have to read Davis his *Miranda* rights again before they could talk again. Karakostas also consistently told Davis that Karakostas could not promise Davis that Davis would be able to go home, but that if Davis was not involved in the events on May 11, Karakostas would recommend that Davis get a bond on his assault charge. After answering Davis's questions, Karakostas reread Davis his *Miranda* rights. Davis indicated that he understood his rights and that he wanted to talk.[4]

Davis then gave his version of the events surrounding Calix's death. Davis admitted to being present in the apartment during the shooting but denied being involved in a murder or robbery, claiming continuously that he was "in the wrong place at the wrong time." According to Davis, Dorman planned to go to Calix's apartment to purchase marijuana and asked Davis to come with him. Davis went with Dorman to Minneapolis, and when they arrived at Calix's apartment, there were "three Mexicans" in the apartment. While Dorman talked to Calix, Davis sat on a couch and watched TV with one of the men in the room. All of a sudden, Davis saw Dorman pull out a gun and Davis ran and hid in a closet with one of the other men, who was later determined to be Norman Arita.[5] Davis then heard one shot and peaked out of the closet. Dorman motioned to Davis that it was time to go, and they left the apartment. After leaving the apartment together, Davis and Dorman split up and Davis returned to his house in Saint Paul.

*District Court Proceeding and Appeal*

On April 30, 2009, a Hennepin County grand jury indicted Davis of aiding and abetting first-degree felony murder.

---

4. Davis also indicated that he did not want Karakostas to have a hand-held recorder in the room. Karakostas told Davis that he would turn the recorder off, but that he would take handwritten notes of the conversation to make sure he got Davis's story down correctly. Karakostas turned the recorder off, but Davis's statement was recorded by a hidden camera in the interrogation room.

5. Minneapolis Police Sergeant Porras spoke to two Hispanic men, Arita and Plinio Portillo Cruz, during the course of the investigation. Both men denied being at the apartment and were otherwise uncooperative with Sergeant Porras. Cruz was deported, and Arita died, before trial, in Mexico.

Minn.Stat. §§ 609.185(a)(3), 609.05. The State alleged that Davis committed aggravated robbery and killed Calix during the course of the robbery or that Davis aided and abetted Dorman in committing a robbery, and Dorman killed Calix. Before trial, Davis moved to suppress, among other statements, his May 18, 2007 statement. Davis also moved to admit hearsay statements given to the police by two witnesses. The district court ruled that Davis's May 18 statement was admissible, but that two later statements were inadmissible.[6] The court also denied Davis's motion to admit the hearsay statements. A jury found Davis guilty of the charged offense, and the court sentenced him to life in prison. Davis appeals.

On appeal, Davis argues that (1) his May 18, 2007, statement should have been suppressed; (2) the district court erred in not admitting certain hearsay evidence; (3) the court erred in allowing a witness to testify about his fear; (4) the court erred in giving a "no-adverse-inference" jury instruction; and, (5) the cumulative effect of these errors entitles Davis to a new trial. Davis also raises several issues in his pro se brief. We address each of Davis's arguments in turn.

## I.

■ We turn first to Davis's argument that his May 18, 2007, statement to Officer Karakostas should have been suppressed either because it was involuntary or because Officer Karakostas violated Davis's right to remain silent. For purposes of this opinion, we assume without deciding that Officer Karakostas violated Davis's right to remain silent when Kara-

kostas continued to question Davis after the first time Davis said: "I don't want to talk." *Cf. State v. Ortega,* 798 N.W.2d 59, 70 (Minn.2011) (concluding that defendant did not "unequivocally invoke his right to remain silent" in part because defendant "did not tell the agents he did not *want* to talk with them"). We further assume, but do not decide, that the district court erred in admitting the statement.[7] When an error implicates a constitutional right, we will award a new trial unless the error is harmless beyond a reasonable doubt. *State v. Larson,* 788 N.W.2d 25, 31 (Minn. 2010). An error is harmless beyond a reasonable doubt if the jury's verdict was "surely unattributable" to the error. *State v. Ferguson,* 804 N.W.2d 586, 592 (Minn. 2011) (citation omitted) (internal quotation marks omitted).

Davis argues that the admission of his statement was not harmless because the State used it to attack his credibility. For its part, the State argues that admission of the statement was harmless because it was exculpatory or cumulative to other evidence. We conclude that the error was harmless beyond a reasonable doubt and therefore the statement's admission does not warrant reversal of Davis's conviction.

■ Preliminarily, it is helpful to break Davis's statement into two portions, the admissible portion given after Davis waived his *Miranda* rights but before he said "I don't want to talk," and the purportedly inadmissible portion after Karakostas allegedly violated Davis's right to remain silent. During the admissible portion, Davis lied to Officer Karakostas about his whereabouts on the night of

---

6. The later statements that the district court suppressed are not relevant to this appeal.

7. Because we assume that the district court erred in admitting the statement on the basis that the statement was obtained through vio-

lation of Davis's right to remain silent, it is not necessary for us to analyze whether it was also an error to admit the statement on the alternative ground that it was not voluntary.

Calix's murder, repeatedly telling Karakostas that he was at his house in Saint Paul. This was a lie—both Gentle and B.B. placed Davis at Calix's apartment at the time of Calix's death—and lying to the police certainly could, as the State argued, have diminished Davis's credibility in the minds of the jurors. But because this portion of his statement was admissible, the damage done to Davis by his statement had already occurred by the time Karakostas allegedly violated Davis's right to remain silent.

During the inadmissible portion of his statement, Davis placed himself in the apartment where Calix was killed, but otherwise repeatedly denied being involved in a robbery or murder. Other than admitting that he was at the apartment, nothing in this portion of Davis's statement linked him to the murder; indeed, if believed, Davis's statement exculpated him from any criminal liability relating to Calix's death. According to Davis, he was an innocent bystander who knew nothing of Dorman's plan to rob Calix. Further, Davis claimed that he was completely uninvolved in, and in fact did not even witness, the shooting. For these reasons, the defense relied on the exculpatory nature of Davis's statement during closing arguments.

■ We conclude that the jury's verdict was surely unattributable to any error in admitting the portion of Davis's statement recorded after he allegedly invoked his right to remain silent. To the extent that the inadmissible portion of Davis's statement could be said to be inculpatory in that Davis changed his story and admitted to being present during the shooting, any error was harmless because mere presence at the scene of a crime does not establish that Davis aided or abetted criminal activity. *State v. Buckingham,* 772 N.W.2d 64, 71 (Minn.2009). Davis's admission to being at the crime scene is also harmless because it was cumulative to other evidence linking Davis to the crime scene, including Davis's statements to Gentle and B.B.'s eyewitness identification. For these reasons, we conclude that any error in allowing into evidence the purportedly inadmissible portion of Davis's May 18, 2007, statement was harmless beyond a reasonable doubt, and accordingly, we hold that the admission of the statement does not entitle Davis to a new trial.

## II.

■ We turn next to Davis's argument that the district court committed plain error by allowing Gentle to testify on redirect examination that when a witness agrees to cooperate with the police, "you put your life at risk" and might "end up killed or something." Davis did not object to this testimony at trial, but on appeal he argues that this evidence was erroneously admitted because the record does not contain any evidence that Davis threatened Gentle and that Gentle's suggestion that he was afraid is unfairly prejudicial. Because Davis did not object to the testimony in question, our review is limited to determining whether there was plain error. Under the plain error test, Davis must show that (1) there was an error; (2) the error was plain; and (3) the error affected his substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). If the first three prongs are met, we must decide "whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.*

■ We have noted that courts "should be concerned that the evidence of fear is not used to create an inference that a defendant is a bad person who is likely to commit a violent crime." *State v. McArthur,* 730 N.W.2d 44, 51 (Minn.2007). But we need not determine in this case whether the district court committed error that

was plain in permitting the testimony at issue, because the State concedes that the court plainly erred in allowing the testimony without giving a cautionary instruction explaining to the jury how to use the testimony.[8] Accordingly, we turn to the third prong of the plain error test.

■ To satisfy the third prong, Davis "bears the heavy burden of showing that there is a reasonable likelihood the error had a significant effect on the verdict." *State v. Patterson*, 587 N.W.2d 45, 52 (Minn.1998) (internal quotation marks omitted). We agree with the State that Davis has not met his burden of showing that Gentle's fear testimony affected Davis's substantial rights. It is highly unlikely that Gentle's brief expression of fear had a significant effect on the verdict. First, Gentle did not testify that he was fearful of Davis; he described the dangers of testifying generally. This type of testimony is reflected in some of our most recent cases involving "snitches," all of whom were murder victims. *See State v. Nissalke*, 801 N.W.2d 82, 89–90 (Minn. 2011); *Gassler v. State*, 787 N.W.2d 575, 579–80 (Minn.2010); *Staunton v. State*, 784 N.W.2d 289, 293–95 (Minn.2010); *Cf. State v. Martinez*, 725 N.W.2d 733, 736 (Minn. 2007) (discussing that an inmate refused to testify at a trial because "living in prison as a snitch was worse than the possibility of a longer sentence for refusing to testify"). Thus, Gentle's testimony did not necessarily indicate that Davis was "connected to the negative consequences" of testifying, which is one of the concerns with allowing testimony of witness fear. *Harris*, 521 N.W.2d at 352. Second, Gentle's fear testimony was cumulative to other evidence regarding Gentle's credibility.

For example, Gentle told the jury that he testified against Davis because "it was the right thing" to do, because he wanted "to get out of the game," and because he "felt bad about the family of the victim that got murdered over marijuana." Moreover, much of Gentle's testimony was corroborated by Davis's telephone calls with Whigham, B.B.'s testimony, and cell phone records linking Davis to Dorman just before the murder. Finally, the State only minimally relied on Gentle's expression of fear. Questions about Gentle's fearfulness take up less than one page of the transcript, while Gentle's overall testimony spans 83 pages. And during closing arguments, the State only briefly mentioned Gentle's fearfulness as one reason, among many, for why the jury should believe him. For these reasons, we conclude that Davis has not shown that there is a reasonable likelihood that the testimony had a significant effect on the verdict. We therefore hold that Davis is not entitled to a new trial on the basis of Gentle's fear testimony.

### III.

We turn next to Davis's argument that the district court abused its discretion by not admitting certain hearsay statements from M.N. and W.H. Both M.N. and W.H. told the police approximately 10 minutes after police arrived at the crime scene that they "saw two black guys running away from the scene." But because neither witness affirmatively stated that they saw the "two black guys" running with a green tub full of marijuana, Davis wanted to introduce these statements to undermine Gentle's testimony. Davis could not call either

8. Although we have assumed that the district court committed error that was plain in admitting Gentle's fear testimony, we also reaffirm that a district court has a duty to provide safeguards, including cautionary instructions, when it admits objected-to evidence of a witness's fear or threats against the witness. *See State v. Harris*, 521 N.W.2d 348, 353 (Minn. 1994) (citing *State v. Wilford*, 408 N.W.2d 577, 580 (Minn.1987)).

witness to testify because, at the time of trial, W.H. was under "some type of mental health commitment" and denied ever speaking to the police, and M.N. could not be found.

Before trial, Davis made a motion to introduce the hearsay statements of M.N. and W.H. under the excited utterance or residual exceptions to the hearsay rule. *See* Minn. R. Evid. 803(2), 807. The district court denied Davis's motion. The court found that 10 minutes was too long after the gunshot for the statements to be excited utterances, that "[t]he nature of the event [was] not so startling as to call for an excited utterance," and that, "[m]ost importantly, there [was] no testimony that the witnesses were excited or startled or under the stress of the event." As to the residual exception, the court found that the statements could not be admitted because both witnesses were very reluctant to talk to the police, that "they did not want to testify," and that their reluctance gave them a "motive to falsify or fabricate" their statements.

We review a district court's evidentiary rulings for an abuse of discretion. *State v. Graham*, 764 N.W.2d 340, 351 (Minn.2009). Absent a clear abuse of discretion, we will not reverse a district court's evidentiary rulings. *State v. Moua*, 678 N.W.2d 29, 37 (Minn.2004). To obtain a reversal of the district court's evidentiary ruling, Davis must prove that the ruling "was erroneous and prejudicial." *State v. Loving*, 775 N.W.2d 872, 879 (Minn.2009). An error is prejudicial "if the error substantially influenced the jury's decision." *Id.*

## A.

Davis first argues that M.N.'s and W.H.'s statements are admissible under the excited utterance exception to the hearsay rule. Minn. R. Evid. 803(2). A hearsay statement is admissible as an excited utterance if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* While there are "no strict temporal guidelines for admitting an excited utterance," the statement must be made while the declarant is "under the stress of excitement" from the startling event. *State v. Martin*, 614 N.W.2d 214, 223–24 (Minn. 2000) (citations omitted). A determination that the declarant was under the "aura of excitement" from the event is key to concluding that a statement qualifies as an excited utterance. *State v. Edwards*, 485 N.W.2d 911, 914 (Minn.1992) (citation omitted); *see also State v. Bauer*, 598 N.W.2d 352, 366 (Minn.1999) (admitting a statement as an excited utterance where there was testimony that the declarant was "very upset," "extremely agitated," and "very afraid"); *State v. Berrisford*, 361 N.W.2d 846, 850 (Minn.1985) (admitting statements as excited utterances where there was testimony that the declarant was "very upset," "scared," and "shaky").

The district court did not err when it declined to admit M.N. and W.H.'s statements as excited utterances. Officer Jarrod Silva was the officer who interviewed both witnesses. According to Silva, M.N. was "very reluctant to talk to [the police]." W.H. was also very reluctant, and told Silva "I am not going to help you. I can't help you." Silva got the impression that W.H. "didn't want to be involved and wasn't going to help [the police] at all." Officer Silva also stated that he did not feel like either witness was "animated" when talking to him.

The district court found that "there [was] no testimony that the witnesses were excited or startled or under the stress of the event." Officer Silva's testimony supports the district court's finding. Because

there is no evidence that either M.N. or W.H. was "under the stress of excitement" when they spoke to police, *Martin,* 614 N.W.2d at 223–24, we hold that the court did not err in refusing to admit their statements as excited utterances.

### B.

■■■ Alternatively, Davis argues that the statements should have been admitted under the residual exception to the hearsay rule. Minn. R. Evid. 807. Rule 807 provides that a "statement not specifically covered by rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness" is admissible if:

(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Minn. R. Evid. 807.

In deciding whether a statement qualifies under the residual exception, courts use a "totality of the circumstances test" to determine whether the statement has "equivalent circumstantial guarantees of trustworthiness." *State v. Robinson,* 718 N.W.2d 400, 408 (Minn.2006). Relevant factors generally considered under this test include: whether the statement was given voluntarily, under oath, and subject to cross-examination and penalty of perjury; the declarant's relationship to the parties; the declarant's motivation to make the statement; the declarant's personal knowledge; whether the declarant ever recanted the statement; the existence of corroborating evidence; and the character of

the declarant for truthfulness and honesty. *State v. Keeton,* 589 N.W.2d 85, 90 (Minn. 1998) (explaining factors under version of residual exception rule previously codified at Minn. R. Evid. 804(b)(5)) (citation omitted).

The district court did not err by declining to admit the statements under Rule 807. Most of the factors we discussed in *Keeton* support the court's ruling on admissibility. Neither witness volunteered to speak with police. The statements were not given under oath and M.N. and W.H. were not subject to cross-examination or penalty of perjury. Both declarants had motivations not to speak to the police because they did not want to get involved as witnesses in the case, and no other evidence corroborates their statements. We therefore hold that the district court did not abuse its discretion in ruling that hearsay statements were inadmissible.

### IV.

■■■ We turn next to Davis's argument that the district court erred by giving a no-adverse-inference jury instruction without Davis's clear consent.[9] Because Davis did not object to this instruction when the court gave it, we review the issue under the plain error standard. We agree with Davis that the district court committed an error that was plain when it gave the instruction without Davis's consent. *See State v. Gomez,* 721 N.W.2d 871, 880 (Minn.2006); *McCollum v. State,* 640 N.W.2d 610, 616 (Minn.2002). But we conclude that the error did not affect Davis's substantial rights.

■■■ Substantial rights are affected if "there is a reasonable likelihood that giving the instruction in question had a

---

9. In a no-adverse-inference instruction, the district court "instruct[s] the jury not to draw any adverse inference from the fact that the defendant has not testified." *State v. Gomez,* 721 N.W.2d 871, 880 (Minn.2006).

significant effect on the jury verdict." *Gomez,* 721 N.W.2d at 880. When, as here, a defendant fails to object to a no-adverse-inference instruction, he "bears a heavy burden of showing that substantial rights have been affected," and "absent a showing of prejudice, [the instruction] is harmless." *Id.*

Davis argues that it was reasonably likely that the no-adverse-inference instruction had a significant effect on the jury's verdict because "[t]here were plenty of issues that a reasonable juror subconsciously would want answered by Davis." Davis contends that, absent his testimony, a juror would have wondered what robbery Davis was discussing with Whigham, what Davis needed to turn into money, how well Davis knew Dorman, why Davis went to Calix's apartment, and how Davis would have responded to Gentle's testimony. Because the no-adverse-inference instruction "only served to highlight for the jury that Davis did not testify on his own behalf to answer these questions," Davis argues that it affected his substantial rights.

Davis has not carried his "heavy burden" in showing that the giving of the no-adverse-inference jury instruction prejudiced him. Before voir dire, the court informed the jury panel, without objection from Davis or his counsel, that the defendant did not have to say or do anything during the trial. During voir dire, Davis's counsel asked seven of the seated jurors if they understood that Davis had a right not to testify, and one of the seated jurors if he understood that Davis had a right to do nothing. Given Davis's trial strategy of highlighting his right not to testify, Davis has not proven that the district court's giving of the no-adverse-inference jury instruction prejudiced him. Rather, Davis's strategy of emphasizing his right not to testify suggests that the court's instruction was simply cumulative and did not serve to highlight Davis's decision not to testify.

In addition, the State's case against Davis was strong. The State's evidence included Davis's admissions to Whigham and Gentle, both before and after the crime, of his participation; phone records connecting Davis to the scene; and an eyewitness, B.B., who put Davis at the scene moments before the shooting. *See Gomez,* 721 N.W.2d at 881–82 (concluding that giving a no-adverse-inference jury instruction without defendant's consent did not impact defendant's substantial rights "[g]iven the totality of the evidence"). Based on this record, Davis has not carried his heavy burden of showing that there is a reasonable likelihood that giving a no-adverse-inference jury instruction had a significant effect on the jury verdict. Consequently, we hold that the district court did not commit plain error by giving the instruction without Davis's clear consent.

## V.

We next turn to Davis's argument that the cumulative effect of the errors at trial entitle him to a new trial. According to Davis, "the totality of the errors significantly impacted [his] ability to present a complete defense and impinged on his right to remain silent [and] [t]hese setbacks were only compounded by the district court's no-adverse-inference instruction."

We have held, in rare cases, that the cumulative effect of trial errors can deprive a defendant of his constitutional right to a fair trial when the "errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury." *State v. Hill,* 801 N.W.2d 646, 659 (Minn.2011) (citation omitted) (internal quotation marks omitted). For ex-

ample, we reversed a conviction based on the "cumulative effect of three instances of prosecutorial misconduct." *State v. Hall,* 764 N.W.2d 837, 847 (Minn.2009) (describing reversal in *State v. Williams,* 525 N.W.2d 538, 549 (Minn.1995)). And in *State v. Underwood* we reversed a conviction in a very close factual case, concluding that "any error, however small, may have prejudiced [the] defendant." 281 N.W.2d 337, 344 (Minn.1979).

█ In a close case, we may be inclined to grant a defendant a new trial based on the cumulative effect of errors that do not individually require a new trial, but this is not such a case. As noted above, the State here produced significant evidence of guilt, including: inculpatory statements Davis made to Whigham both before and after the murder (explaining before the murder that Davis was about to commit a robbery and, after, that it was "all bad," that "some shit happened" during the robbery, and that "somebody had to go and it wasn't me"); lying to the police about his whereabouts on the night of Calix's death; B.B. identifying Davis and Dorman entering Calix's apartment building 3 minutes before the murder; B.B. testifying that Davis was holding something (that the jury could reasonably have inferred was a gun) on his side as he walked towards Calix's apartment; phone records showing several calls between Davis and Dorman, and Dorman and Calix on the day of the murder; and Gentle's testimony. Moreover, as we have concluded above, the errors at issue in this case were not prejudicial. In short, this case

does not resemble the close factual cases in which we have ordered new trials for cumulative errors. *See Hall,* 764 N.W.2d at 847 (declining to award a new trial based on cumulative impact of various trial errors). Because the district court's errors, weighed together, were not "enough to tip the scales" toward producing a biased jury, we decline to grant Davis a new trial based on their cumulative effect. *Hill,* 801 N.W.2d at 659 (citation omitted) (internal quotation marks omitted).

## VI.

Finally, we turn to the claims raised by Davis in his pro se supplemental briefs. While Davis raises dozens of specific issues in his briefs, the issues fall into six categories: (1) Fifth and Sixth Amendment violations related to the deportation of a potential witness, *see United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); (2) a *Batson* violation, *see Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (3) claims of false testimony by Gentle before the grand jury and at trial, *see Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); (4) violations of the right to due process; (5) claims of prosecutorial misconduct; and (6) ineffective assistance of trial counsel.[10] After carefully reviewing each of these claims, we conclude that they all lack merit and, therefore, we hold that Davis is not entitled to a new trial based on the issues raised in his supplemental pro se briefs. *See State v. Wallace,* 558 N.W.2d 469, 473–74 (Minn.1997) (disposing of first-degree

---

**10.** Davis claims that his trial counsel was ineffective because counsel should have: objected to Gentle's allegedly false grand jury testimony and the introduction of the green tub at trial; raised the deported witness issue referenced above; interviewed a potentially helpful witness, "Coco"; and raised the *Batson* challenge referenced above. These

claims are without merit because counsel's failure to raise meritless objections is not ineffective assistance of counsel, and because decisions about which witnesses to interview are typically matters of trial strategy that we will not review. *See State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986).

felony murder appellant's meritless pro se claims in summary fashion).

Affirmed.