# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-2299

_____

Jerome Emmanuel Davis

*Petitioner - Appellant*

v.

Warden Kent Grandlienard

*Respondent - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 9, 2016
Filed: July 7, 2016

_____

Before SHEPHERD, BEAM, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Jerome Davis was convicted in the Hennepin County, Minnesota District Court of aiding and abetting first-degree felony murder and sentenced to life in prison. In his direct appeal to the Minnesota Supreme Court, Davis claimed, inter alia, that the state trial court erred when it admitted a statement he made to police while in custody because the police violated his Fifth Amendment right to remain silent. The Minnesota Supreme Court concluded that any error committed by the trial court was

harmless beyond a reasonable doubt. Davis filed a petition for writ of habeas corpus in federal court, challenging the Minnesota Supreme Court's determination that admission of his statement to police was harmless error. The district court[1] adopted the report and recommendations of the magistrate judge[2] and denied Davis's Miranda[3] claim. Davis timely appealed. Having jurisdiction under 28 U.S.C. § 1291, we now affirm.

I.

On the evening of May 11, 2007, Minneapolis police officers responded to a 911 call reporting gunshots and found Armando Calix, shot in the neck and bleeding in front of his apartment building. Calix bled to death, and the medical examiner pronounced him dead at the scene. Officers searched the apartment for other victims or suspects but found no one else at the scene. Forensic officers examined the apartment, gathered evidence, and took DNA samples. Inside the apartment, officers found a bullet hole in a window, bullet fragments near the window, and a knife with Calix's blood on it. Officers initially questioned two bystanders who reported they had observed two men running away from the building, but did not follow up with the bystanders.

Police investigators also contacted the 911 caller, Brinett Beckford, who had been visiting family in a building across an alley from Calix's apartment building. Beckford reported that he looked out a window shortly before the shooting and saw two young men crossing the alley. The two men passed through a gap in a fence then

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

[2]The Honorable Jeffrey J. Keyes, United States Magistrate Judge for the District of Minnesota.

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

entered an apartment building. Beckford did not know their names but claimed he recognized them because he had seen them on prior occasions in the same area. He described the height, weight, complexion, and hair style of each man. Beckford also told investigators he observed one of the men, later identified as Davis, hit his hip on a metal fencepost as he moved through the fence gap, then put his hand on his hip, hold his side, and pull in his stomach to pass through the gap. Shortly thereafter, just past 8:00 p.m., Beckford drove through the alley to leave the building and heard what sounded to him like a gunshot. Beckford immediately called 911. At a later date, Beckford met with police to perform a photo lineup and identified Toriano Dorman as the taller, dark-skinned man from the alley, and Davis as the shorter, light-skinned man.

Investigators discovered Calix last received a phone call at 8:01 p.m. on the night of the shooting. Further investigation of the phone number that called Calix led police to Dorman, and an investigation of Dorman's associates led police to Davis. Police obtained several phone numbers used by Davis and asked the county jail to search for calls made by inmates to one of those phone numbers. Four phone calls between inmate Anthony Whigham and a man believed to be Davis were discovered. The man, who investigators believed to be Davis, told Whigham during the first recorded phone call, on the day before the shooting, that he was "about to rob somebody" and that a white woman was attempting to set up a "lick" for him. If the "lick" went well, the man would receive $10,000, $1,500 of which he would give Whigham to hire a lawyer. Whigham asked the man for the phone number of Jovan Gentle, and the man responded with two phone numbers.

The day after the shooting, a second call took place, during which the man told Whigham "it's all bad." Whigham asked, "something went down?" to which the man replied, "yeah." "Is it what I think it is?" asked Whigham. The man responded, "I think so." During the third call, placed two days after the shooting, the man told Whigham he "had to do some business shit," adding "it ain't go as smoothly as I

wanted it to go" and "[s]omebody had to go and it wasn't me." Whigham asked the man if he received "something out of the situation," and the man said "yep," and that he needed to turn it into money. During the last call, the man mentioned to Whigham that the news covered his "situation" and provided Whigham a new phone number to call. The new number was a land line connected to an apartment in St. Paul, Minnesota. On the same day, police obtained a search warrant for that St. Paul apartment, and upon searching, found seven cell phones, including one with a phone number matching that called by Whigham from the county jail.

Gentle later met with police and provided a statement containing the following information. Gentle contacted Davis on the afternoon of May 11, 2007, the day of the shooting, regarding a wristwatch. The two men met that afternoon. According to Gentle, Davis drove a four-door blue Caprice with two passengers, one of whom was Dorman. During an argument between Gentle and Davis about the wristwatch, Dorman exited Davis's car "clenching" a revolver, but Davis ordered Dorman to go back inside the car. Gentle and Davis parted ways after the argument, but later in the day, Gentle received a phone call from Davis asking him to meet again and help with a robbery. Gentle initially indicated he would help, but changed his mind and stayed home. Davis later came to Gentle's house, where Gentle claimed Davis told him that "he hit the lick on a Mexican" and showed him a laundry tub containing fifteen to twenty pounds of marijuana. Gentle told police that Davis confessed to shooting a Mexican man "one time in the chest," then taking the marijuana and running out of the room with Dorman. Davis also showed Gentle two handguns. Gentle then claimed he and Davis drove separately to buy baggies to package the marijuana, and while driving on a bridge over a river, he saw Davis throw something out of his car window. According to Gentle, Davis later admitted to him that the objects he threw out of the window were the handguns. Separate from Gentle's statement, cell phone records verified that Dorman was in contact with both Davis and Calix on the day of the shooting. The last phone call from Dorman to Calix, at 8:01 p.m., was routed through a cell tower only a few blocks from Calix's apartment building.

-4-

Police arrested Davis for his involvement in an unrelated assault one week after the shooting. Davis called Gentle from jail several times, speaking in "code" and asking for money so that he could post bail before the homicide detectives figured "out what was going on." Davis was placed in an interview room with concealed audio and video recording equipment, where Sergeant Karakostas, a homicide investigator, interviewed him. Karakostas, who held a hand-held recorder, informed Davis of his <u>Miranda</u> rights and began to interview him about his whereabouts on the night of the shooting. Davis initially claimed he had been home in St. Paul the entire day. Karakostas continued questioning about the day of the shooting, prompting Davis to worry aloud whether he was being questioned solely about the assault. Karakostas told Davis that his name had "come up in something else too." When Davis asked whether he could go home after the interrogation, Karakostas replied in the negative, explaining that he was going to jail for the assault and that he was "getting [himself] kind of jammed up on something" else. Davis became visibly agitated and said, "I don't know about nothing that's going on." He repeatedly stated that he wanted to simply go to jail for the assault and told Karakostas, "I don't want to talk. I don't want to talk." Karakostas told Davis that whether he wanted to talk was a personal decision, but that he probably should talk to the police. Davis replied that he did not want to go to jail because he did not do anything wrong.

Karakostas continued his inquiry regarding Calix's death and implied that Davis had been identified. Davis again requested that Karakostas take him to jail for the assault: "take me to jail . . . I don't, you can cut that off, I don't have nothing to say. 'Cause I ain't done nothing. I didn't assault nobody . . . I don't know nothing about that." Karakostas indicated the interview could end at that time if Davis wanted it to end, to which Davis again stated "I don't want to talk." Karakostas handed a business card to Davis and encouraged him to call if he changed his mind. Davis noted from the business card that Karakostas was with the homicide division and asked, "homicide unit . . . you got me in a homicide?" Karakostas asked Davis if he wanted to continue talking. Davis responded by asking questions about why he

was going to jail that day. Karakostas disclosed more information about the police department's knowledge of Davis's involvement in Calix's shooting. Davis then said, "[m]y rights says anything I say can and will be used against me in the court of law. So if I tell you the truth or anything is it gonna be used against me in a court of law, so I don't . . . so what's my point of talking to you? I might as well talk to a lawyer, someone who can help me." Karakostas clarified that Davis did, in fact, want an attorney present for questioning and suspended the interrogation.

Davis asked if Karakostas would bring him water. When Karakostas returned a few minutes later with the water, he told Davis it "shouldn't be too much longer" until an attorney arrived for Davis. Davis made hand motions indicating Karakostas should remain in the room and asked him to close the door. He asked Karakostas if he could go home if he revealed what he knew about the shooting. Karakostas informed Davis that he would have to read Davis his Miranda rights again before they could resume their conversation, and that he could not promise Davis would be able to go home. Karakostas reassured Davis that if he was not involved in the shooting, he would recommend a bond on the assault charge. Karakostas answered more of Davis's questions and read his Miranda rights again. Then, he asked Davis to tell his version of events from May 11, 2007 after Davis indicated he understood his rights and wanted to talk. Karakostas also agreed to turn off his hand-held recorder but did not alert Davis to the concealed recording equipment in the room.

In his statement recorded by the audio and video equipment in the interview room, Davis admitted to Karakostas that he was inside Calix's apartment during the shooting but denied involvement in the murder or robbery, consistently claiming that he was "in the wrong place at the wrong time." Dorman planned to go to Calix's apartment to buy marijuana and Davis agreed to go with him. Davis averred that "three Mexicans" were in the apartment. While Dorman spoke with Calix, Davis watched TV on a couch with one of the other men. Suddenly, Davis saw Dorman pull out a gun. Davis ran and hid in a closet with one of the other men, then heard a gun

-6-

shot. He peeked out of the closet and saw Dorman motioning to him that it was time to go. Davis then left the apartment with Dorman, after which the men split up and Davis returned to his apartment in St. Paul.

Davis was indicted in Minnesota state court for causing the death of Calix, "acting alone or intentionally aiding, advising, hiring, counseling or conspiring" with Dorman, while using a firearm, "with intent to effect the death" of Calix "while committing or attempting to commit the crime of aggravated robbery." Davis moved to suppress the recording of his statement to Karakostas, but the trial court denied the motion, concluding the statement was voluntary and that Karakostas did not use any improper techniques. Several hours of the recorded interview were played at trial. The State did not present any witnesses who were in Calix's apartment at the time of the shooting. Beckford and Gentle each testified as to their knowledge of the events. The state also played the recordings of the jail calls between Whigham and the person at Davis's phone number. In closing statements, the state emphasized the changes in Davis's story over the course of his interview with Karakostas.

Following a four-day trial, the jury convicted Davis of first-degree felony murder. At sentencing, Davis maintained that he did not commit the offense. The trial court sentenced Davis to life imprisonment. Davis appealed his conviction to the Minnesota Supreme Court, arguing that his videotaped statement was obtained in violation of his right to be free from compelled self-incrimination under <u>Miranda</u> and <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986). The Minnesota Supreme Court affirmed Davis's conviction, dividing the statement into two parts: "the admissible portion given after Davis waived his <u>Miranda</u> rights but before he said 'I don't want to talk,' and the purportedly inadmissible portion after Karakostas allegedly violated Davis's right to remain silent." <u>State v. Davis</u>, 820 N.W.2d 525, 533 (Minn. 2012). The court concluded that "the jury's verdict was surely unattributable to any error in admitting the portion of Davis's statement recorded after he allegedly invoked his right to remain silent." <u>Id.</u> at 534. Reasoning that "any error was harmless because mere

-7-

presence at the scene of a crime does not establish that Davis aided or abetted criminal activity" and that Davis's statement was cumulative to other testimony, the court held that admission of Davis's full statement did not entitle him to a new trial. Id. (citing State v. Buckingham, 772 N.W.2d 64, 71 (Minn. 2009)).

Davis filed a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus. A magistrate judge issued a report and recommendation recommending that the district court deny the petition but grant a certificate of appealability as to the following question: "Was the Minnesota Supreme Court's finding objectively unreasonable that any error in admitting Davis's statements from interrogation after his invocation of his right to silence was harmless beyond a reasonable doubt?" The district court adopted the report and recommendation in its entirety over Davis's objections and granted the certificate of appealability as recommended by the magistrate judge. Davis made a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e), which the district court denied. This timely appeal followed.

II.

On appeal, Davis contends that the Minnesota Supreme Court unreasonably applied federal law when it concluded that the admission of his videotaped statements at trial was "harmless beyond a reasonable doubt," and the district court therefore erred when it held otherwise. Because Davis appeals from a denial of habeas relief, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d) applies. Under AEDPA, habeas relief will not be granted with respect to any claim adjudicated on the merits in State Court proceedings, unless such adjudication resulted in a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d). "AEDPA's highly deferential standards kick in" where the prisoner's claim has been adjudicated on the merits in state court. Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015) (citing Harrington v. Richter, 562 U.S. 86, 103 (2011)). Where a state court holds that any federal error was harmless beyond a reasonable doubt, the decision constitutes an adjudication on the merits. Id. If a prisoner's constitutional rights were violated as a result of the state court's decision, the prisoner must also demonstrate that the error was prejudicial, as federal courts may not grant habeas relief unless the error in the state trial had a "substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 116 (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)).

The Minnesota Supreme Court assumed without deciding, for purposes of its opinion, that Karakostas violated Davis's right to remain silent when he continued to question Davis after Davis first said "I don't want to talk." Davis, 820 N.W.2d at 533. The court also assumed without deciding that the Minnesota district court erred in admitting the statement after that point, leaving the sole focus of the issue on whether the error was harmless beyond a reasonable doubt. Id. The court pointed out that after Davis waived his Miranda rights but before he told Karakostas "I don't want to talk," Davis lied about his whereabouts on the night of Calix's murder and provided a version of events that was contradicted by both Gentle and Beckford, the 911 caller. Id. at 533-34. Because that portion of the statement was admissible, the court concluded the damage to Davis's credibility occurred before Karakostas allegedly violated Davis's right to remain silent. Id. at 534.

The purportedly inadmissible portion of Davis's statement placed him in Calix's apartment at the time of the shooting; however, the court recognized that Davis "otherwise repeatedly denied being involved in a robbery or murder." Id. The court also noted that, in the purportedly inadmissible portion of the statement, Davis claimed to be an innocent bystander in the apartment and that the defense relied on the exculpatory nature of Davis's statement during closing arguments. Id.

Accordingly, the court concluded that "the jury's verdict was surely unattributable to any error in admitting the portion of Davis's statement recorded after he allegedly invoked his right to remain silent." Id. The court determined Davis's admission to being at the crime scene was harmless because mere presence at the scene of a crime is insufficient to establish Davis aided or abetted criminal activity and it was cumulative to other evidence linking Davis to the crime scene. Id. Concluding that any error in allowing the purportedly inadmissible portion of Davis's statement into evidence was harmless beyond a reasonable doubt, the court held that admission of the statement did not entitle Davis to a new trial. Id.

Davis argues that the portion of his statement recorded after he told Karkostas "I don't want to talk" is inadmissible under Miranda, that the jury's verdict was not "surely unattributable" to the trial court's erroneous admission of the statement under Sullivan v. Louisiana, 508 U.S. 275 (1993), and that the trial court error had a "substantial and injurious effect" on the verdict under Fry, 551 U.S. at 112. Specifically, Davis argues the latter portion of his statement is inadmissible because he invoked his right to remain silent, after which "the interrogation must cease." See Miranda, 384 U.S. at 473-74. Like the Minnesota Supreme Court and the district court, for purposes of this opinion, we also assume that the latter portion of Davis's interview was inadmissible due to the Miranda violation.

Davis contends that after the state trial court erroneously admitted that portion of the statement, his admission to being in Calix's apartment at the time of the shooting encouraged the jury to disbelieve Davis's initial statement that he was not at the crime scene, harmed his credibility uniquely by using his "own words" as opposed to the testimony of other witnesses, and did not amount to cumulative testimony because no forensic evidence or eyewitness testimony linked him directly to the shooting. The jury's verdict could not have been "surely unattributable" to the erroneous admission of the statement according to Davis. See Sullivan, 508 U.S. at 279. Finally, Davis asserts that those same arguments support a finding of a

-10-

"substantial and injurious effect" of the error on the verdict, proving the prejudicial impact of the state court error. See Fry, 551 U.S. at 120. For all of these reasons, Davis contends that the Minnesota Supreme Court unreasonably applied federal law.

The government notes the highly deferential standard applied under AEDPA when a federal habeas claim has been adjudicated on the merits in state court and contends that the Minnesota Supreme Court's determination that the state trial court's admission of the inadmissible portion of Davis's statement was not an objectively unreasonable application of United States Supreme Court precedent. See Ayala, 135 S. Ct. at 2198. Emphasizing that Davis used the admission of the full statement to present an exculpatory version of the events without subjecting himself to cross-examination by testifying at trial, the government argues that Davis used the challenged portion of the statement as a centerpiece of his defense, so the Minnesota Supreme Court's reliance on the exculpatory nature of the statement was objectively reasonable. The government further urges this Court that the statement was cumulative to other evidence linking Davis to the crime, damage to Davis's credibility occurred during the admissible portion of the statement, and the state's other evidence against Davis was overwhelming. For those reasons, the government contends that the Minnesota Supreme Court's decision was not "so lacking in justification" that no fair-minded jurist could possibly agree with its ruling. Id. at 2199.

A state court decision is "contrary to" clearly-established federal law if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court reaches the opposite result in a case involving facts that are materially indistinguishable from relevant Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 405 (2000). "A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [United States Supreme Court] opinions." Mitchell v. Esparza, 540 U.S. 12, 16 (2003) (per curiam) (internal citation omitted). Here, the Minnesota

Supreme Court did not reach a legal conclusion opposite any holdings of the Supreme Court, and Davis cites no Supreme Court case with materially indistinguishable facts in which the Supreme Court found the admission of a defendant's statement to be harmful error. Although the Minnesota Supreme Court relied heavily on its own precedent, it did not decide Davis's case in a manner "contrary to" clearly-established federal law.

We next examine whether the Minnesota Supreme Court's decision resulted in a decision that involved the unreasonable application of clearly-established federal law. The "unreasonable application" clause requires the state court decision to be "objectively unreasonable," which demands the decision be more than incorrect or erroneous. Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (citing Williams, 529 U.S. at 409-10). The "objectively unreasonable" standard is not satisfied even by clear error. Escobedo v. Lund, 760 F.3d 863, 869 (8th Cir. 2014) (citing Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). The state court's application of federal law may even be erroneous or incorrect in our independent judgment without being "objectively unreasonable." Engesser v. Dooley, 457 F.3d 731, 736 (8th Cir. 2006) (citing Clemons v. Luebbers, 381 F.3d 744, 750 (8th Cir. 2004)).

We fail to find any unreasonable application of clearly-established federal law in the Minnesota Supreme Court's decision. The court provided a detailed analysis, as described above, explaining that any error committed by the state trial court when it admitted the inadmissible portion of Davis's statement was harmless beyond a reasonable doubt based on clearly-established federal law. As the district court noted, the admission of Davis's full statement was cumulative to other testimony, served exculpatory purposes in the defense's case, and did not further damage Davis's credibility given the proper admission of the earlier portion of his statement. We agree with the district court and cannot say the Minnesota Supreme Court's decision involved an unreasonable application of any United States Supreme Court precedent.

## III.

The Minnesota Supreme Court's decision in <u>Davis</u> adjudicated the merits of Davis's case, but did not result in a decision that was contrary to, or involved the unreasonable application of, clearly-established federal law as required by AEDPA before a writ of habeas corpus can be granted. Accordingly, we affirm the decision of the district court and deny Davis's petition for a writ of habeas corpus.

KELLY, Circuit Judge, concurring in the judgment.

The outcome of this case turns on the Minnesota Supreme Court's determination that the inadmissible portion of Davis's statement to Sergeant Karakostas was exculpatory, cumulative, and not more damaging to Davis's credibility than the admissible portion of the statement. I disagree, and believe that the state court was incorrect in concluding that the admission of Davis's statement was harmless beyond a reasonable doubt. However, because we are limited to considering whether the state court's decision was an unreasonable application of federal law, I concur in the judgment of the court.

The inadmissible portion of Davis's statement was not truly exculpatory because it unequivocally placed him in the apartment at the time of the shooting. Though he denied having committed the actual shooting, his explanation of his presence in the apartment was the only evidence that directly placed him at the scene of the crime. For this same reason, the statement was not cumulative. Though other evidence linked Davis to the crime scene generally, only his own words placed him in that exact apartment at the precise time of the shooting. And while Davis's credibility was already damaged by the admissible portion of his statement, I believe it was undoubtedly more damaging for the jury to hear two inconsistent stories about the events surrounding the shooting from Davis himself. Though the jury could

-13-

certainly have found the admissible portion of Davis's statement not credible in light of the other evidence in the case, hearing the full statement all but guaranteed that they would be unwilling to find any aspect of his defense credible. Given the perhaps intangible but definitely harmful effects the entirety of Davis's statement could have had on the jury, I could not conclude that it was harmless beyond a reasonable doubt. Ayala, 135 S. Ct. at 2197; see also Garcia v. Long, 808 F.3d 771, 782 (9th Cir. 2015) (improper admission of the defendant's confession was not harmless where his "initial denial of the allegations and subsequent contradictory admission seriously undermined his own credibility and correspondingly bolstered [the victim's] credibility"); Gov't of Virgin Islands v. Davis, 561 F.3d 159, 166–67 (3d Cir. 2009) (the prosecutor's improper references to the defendant's failure to provide his exculpatory version of events to the police was not harmless, where "the conflicting versions of the shooting" meant that "the credibility of the witnesses was crucial to the jury's verdict"); Velarde v. Shulsen, 757 F.2d 1093, 1095 (10th Cir. 1985) ("where the very essence of a case is the jury's evaluation of defendant's credibility, the admission of tainted evidence [damaging the defendant's credibility] cannot be considered harmless"); Grizzell v. Wainwright, 692 F.2d 722, 726 (11th Cir. 1982) (where substantial evidence placed the defendant at the scene of the crime, but his own testimony exonerated him from the crime itself, the erroneous admission of misdemeanor convictions to impeach his credibility was not harmless); Hinman v. McCarthy, 676 F.2d 343, 350–52 (9th Cir. 1982) (admission of the defendant's statement, obtained in violation of his Miranda rights, was not harmless where the statement impeached the defendant's testimony that he had no intent to rob the victim). Though the jury could have found Davis guilty even without the inadmissible portion of the statement, I am unable to summon any certainty that the admission of the statement did not contribute to the jury's verdict. Mitchell, 540 U.S. at 18.

However, on our review of the Minnesota Supreme Court's decision, we may not directly apply the harmless error standard to the facts of this case, but must

instead consider whether the Minnesota Supreme Court's application of the standard was objectively unreasonable. Id.; Ayala, 135 S. Ct. at 2197–98. Though I disagree, I cannot say that it was unreasonable for the state court to conclude that the inadmissible portion of the statement was harmless beyond a reasonable doubt. The court could have reasoned that because the literal words of the statement did exculpate Davis from the actual shooting, and because there was other evidence linking him to the crime, the jury's verdict was "surely unattributable" to the inadmissible portion of Davis's statement. United States v. Holmes, 620 F.3d 836, 846 (8th Cir. 2010). The Minnesota Supreme Court's decision, though in my view incorrect, was not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." Ayala, 135 S. Ct. at 2199 (quoting Harrington, 562 U.S. at 103). Accordingly, I concur in the judgment of the court.

_____